[No. B231347. Second Dist., Div. Eight. Oct. 22, 2012.]

HARBOR REGIONAL CENTER, Plaintiff and Appellant, v.
OFFICE OF ADMINISTRATIVE HEARINGS, Defendant and Respondent;
HANNAH G., a Minor, etc., et al., Real Parties in Interest and Respondents.

294

**COUNSEL**

Michelman & Robinson, Mona Z. Hanna and Robin James for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Beltran, Beltran, Smith, Oppel & Mackenzie and Thomas E. Beltran for Real Parties in Interest and Respondents.

---

**OPINION**

**RUBIN, J.**—Harbor Regional Center (Harbor) appeals from the judgment in this administrative mandate action, contending that the trial court erred by determining that an administrative law judge (ALJ) from the state's Office of Administrative Hearings (OAH) had jurisdiction under the Lanterman Developmental Disabilities Services Act (Lanterman Act or Act; Welf. & Inst. Code, § 4500 et seq.) to order the center to pay a higher wage to the in-home care provider of a severely disabled girl.[1] We conclude that under the circumstances of this case, jurisdiction to hear such disputes rests with the OAH, and therefore affirm the judgment.

## INTRODUCTION

█ After several years of acquiescing to administrative law orders to fund salaries above the established rate to the caregivers of a profoundly disabled girl receiving services under the Lanterman Act, Harbor chose to dispute a temporary pay increase of approximately $1,650 for a substitute caregiver. At issue over this small sum are the rights of developmentally disabled children to contest decisions by service agencies such as Harbor to refuse funding for pay increases above the state-approved general rate. We hold that such increases may be required by unique circumstances in order to fulfill the Lanterman Act's mandate to take all steps possible to keep such children at home with their families.

## FACTS AND PROCEDURAL HISTORY

1. *Background on Hannah's Medical Condition*

Within a few months of Hannah G.'s birth in 1996, she was diagnosed with Canavan disease, a rare genetic defect that causes progressive deterioration of myelin, the so-called "white matter" of the brain that protects nerve function. Symptoms such as visual inattentiveness and a decline in motor skills eventually progress to loss of muscle tone, deafness, inability to move, seizures, feeding problems, an enlarged head, and lack of cognitive skills. There is no cure and the disease is always fatal. Most children die by age four, though some may live into their teens or early adulthood.

---

[1] All further undesignated section references are to the Welfare and Institutions Code unless otherwise stated.

By 2009, when Hannah was almost 13, she was 42 inches tall and weighed 42 pounds, a size more typical of a six year old. She was blind, and was unable to walk, feed or care for herself, or sit up without help. As a result, Hannah required around-the-clock care for all of her needs. Despite these disabilities, Hannah could hear and understand what people said, and could respond in turn by whining or through body language. She needed to be told in advance if her routine would change. If not, she became upset. Hannah was considered highly intuitive and aware of other people's feelings.

Over the years, Hannah's mother, Sandra G., had devised an extensive daily regimen that included range of motion exercises, stretching, and tactile stimulation designed to ward off the effects of Canavan disease. This program had been largely successful, and Hannah was doing much better than the typical Canavan sufferer.

Although Hannah's parents took on much of the burden of her care, Hannah's disabilities qualified her for assistance under the Lanterman Act and other programs. By the time of the 2009 administrative hearing at issue here, the family received 283 hours of in-home support each month through Los Angeles County and 372 hours per month of nonmedical care under the Lanterman Act through Harbor. Harbor is one of 21 nonprofit corporations approved by the State Department of Developmental Services (DDS) to oversee the delivery of services under the Act. Harbor in turn contracted with Cambrian Home Care to provide services to Hannah.

2. *Administrative Rulings Order Harbor to Provide Increased Care and Fund Higher Caregiver Wages*

The high level of care Hannah receives was the result of a series of orders by ALJ's from the OAH who conducted several hearings between 2000 and 2009 pursuant to Hannah's right to a fair hearing under the Lanterman Act.[2] (§§ 4705–4706.)

As a result of these hearings, Harbor was first ordered to increase the amount of in-home care it was funding for Hannah from 84 hours a month to 84 hours per week. Harbor was later ordered to reimburse Sandra more than $28,000 she had paid to supplement the income of, and provide sick leave and vacation pay to, the Cambrian employee who had become Hannah's primary caregiver. Harbor was eventually ordered to make that pay increase prospective.[3]

---

[2] This statutory right is critical to our analysis, and is described in parts 1.A. and 2. of our Discussion.

[3] The September 2009 administrative order on appeal here was preceded by seven others: (1) the November 2000 order to increase Hannah's care from 84 hours a month to 84 hours a

These administrative rulings were based on Lanterman Act requirements that regional centers be flexible and innovative when designing programs for each individual disabled person they serve, and take all steps possible to keep disabled children at home. These policies were called into play, the ALJ's ruled, because of the program Sandra had developed to deal with Hannah's unique and extraordinary disabilities. As one ALJ concluded, instead of a typical request for services, Sandra "has created a behavioral and living skills program for her child and has fully implemented that program for [Hannah]" and was essentially seeking funding for that program.

Sandra's program required a level of care and commitment that most prospective caregivers could not meet, especially with the low level of compensation offered by Cambrian—$9.50 per hour with no vacation time or sick leave. This was compounded by Sandra's high expectations, the odd work hours, and transportation difficulties getting to Sandra's home. Nearly all the prospective caregivers that Cambrian sent to the house walked away from the job because of these issues.

As a result, Sandra went through outside employment agencies to locate adequate caregivers on her own. One of those, Vivian Mendez, began working with Hannah approximately in 1997, and began to be employed through Cambrian in February 2000. Mendez eventually became Hannah's primary caregiver. Over the years, Mendez formed a close bond with Hannah and her family, and had become intimately familiar with Hannah's program and the girl's needs. The work Mendez performed was much harder than that of most home health aide workers. Losing Mendez would "devastate" Hannah's care, and it would take a long time to find someone to replace her.

Even though Harbor had increased Mendez's hourly wage to $11.50 in recognition of these facts, the increase was not enough to have her remain as

week; (2) a May 2002 order rejecting Harbor's claim that it should resume providing only 84 hours of care each month because Hannah was attending school; (3) a December 2002 order that Harbor reimburse Sandra approximately $28,000 in extra wages and benefits that she paid Vivian Mendez and another caregiver, but rejecting Sandra's claim for reimbursement of the finder's fee she paid to the outside agency that helped locate those two caregivers; (4) a May 2005 order permanently raising Mendez's hourly rate to $16.25; (5) a May 2007 order to reimburse Sandra and her family for psychotherapy; (6) an August 2008 order to raise Mendez's hourly wage by 49 cents and to reimburse Sandra for modifying the family's van to make it wheelchair accessible, but rejecting Sandra's claims for reimbursement of physical therapy costs and for extra wages and benefits paid to another caregiver; and (7) a March 2009 order that Harbor resume providing Mendez vacation pay, as previously ordered.

Except for the final 2009 ruling on appeal here, Harbor never challenged any of these administrative rulings or their factual findings by bringing an administrative mandate action. On appeal, Harbor does not dispute the facts from any of the administrative hearings or from the trial court judgment we now review. As set forth in our Standard of Review, this leads us to accept as true the factual findings from those hearings, and this part of our Facts and Procedural History is a distillation of the relevant findings from those hearings.

Hannah's caregiver. Sandra therefore paid Mendez extra wages out of her own pocket, along with sick leave and vacation time. Because Cambrian was unable to provide adequate caregivers under its normal employee compensation plan, and because the Lanterman Act required flexibility to meet unusual circumstances, Harbor was first ordered to reimburse Sandra for the sums she had paid Mendez, and was later ordered to fund a permanent pay raise to $16.25 per hour, along with vacation time and holiday pay. Another raise of 49 cents per hour was ordered in 2008 based on Mendez's superior qualifications.

After Harbor stopped funding vacation pay for Mendez in 2008, an ALJ ordered it to resume doing so because Mendez's services were invaluable and no other comparable services were available.

3. *Harbor Is Ordered to Fund a Higher Wage for Mendez's Temporary Replacement*

The administrative mandate action that led to the judgment on appeal here arose from a July 2009 hearing initiated by Sandra to make Harbor fund a temporary pay raise of $2.50 per hour to Irma Murphy, who had taken over Mendez's role as Hannah's primary caregiver while Mendez was out on maternity leave. The ALJ who conducted that hearing concluded that Sandra had proven Hannah's entitlement to that order because Murphy was assuming Mendez's role during her maternity leave and was qualified to do so. The ALJ also found that this was "a cost-effective way to meet [Hannah's needs]." The ALJ therefore ordered Harbor to reimburse the family for amounts it had paid to Murphy to cover the wage difference, and to fund the increased salary from then on until Mendez returned from her maternity leave.[4]

4. *Harbor's Administrative Mandate Petition*

In response to the ALJ's July 2009 order to fund a temporary pay increase for Murphy, Harbor brought an administrative mandate action in superior court against OAH, naming Hannah as the real party in interest.[5] (Code Civ. Proc., § 1094.5, subd. (b).) The petition did not dispute any of the underlying facts concerning Hannah's condition or the services she required. Instead, it alleged that only DDS had the power to determine pay rates for service

---

[4] This order changed Murphy's hourly rate from $12.50 to $15, which was still less than Mendez received. Mendez has long since returned from her maternity leave, and the parties agree that the amount in dispute in this appeal is approximately $1,650. Based on a 40-hour workweek, this means Mendez's leave lasted 16.5 weeks.

[5] OAH filed a notice of nonappearance, and the action was defended by Sandra as guardian ad litem for Hannah.

providers like Cambrian, and that pursuant to DDS regulations enacted to implement the Lanterman Act, the right to appeal any such decision rested solely with Cambrian. The petition also alleged that the temporary pay increase order violated recent legislation that barred any rate increases due to the state's fiscal crisis. Based on this, Harbor alleged that OAH exceeded its jurisdiction and abused its discretion.

The record from the administrative hearing was admitted in evidence at trial, including the transcript of witness testimony, the previous administrative hearing orders, and various documents relating to Hannah's condition and need for care, including the individual plan developed by Harbor and Sandra for that care.

Sandra testified that she devised Hannah's extensive daily regimen, which included range of motion exercises, massage, tactile stimulation, and oral motor exercises to help Hannah eat and drink. According to Sandra, Cambrian cannot just send over a new caregiver because it takes weeks of training by Sandra to learn how to handle Hannah safely and competently. Sandra did not think she could leave the house for 10 minutes with such persons because they would not know how to pick up Hannah, put her in her exercise equipment, feed her or give her water, or help her if she had trouble swallowing.

The level of care Hannah gets is so intense, Sandra testified, that without appropriate care at home, the only alternative, as Harbor once advised, would be placing Hannah in a pediatric nursing home. Doing so would disrupt the lives of Hannah and her family, and was something they could not afford.

Ed Swan is a Harbor service coordinator and had been Hannah's counselor since 2006. He testified that respite care is designed to give parents a break from caring for a disabled child, and that Cambrian is a respite care agency. However, the care Hannah gets is not respite care and is considered nonmedical. Swan agreed that most of Hannah's caregivers had been located by Sandra, and acknowledged the difficulties in finding adequate caregivers, including the travel time and the rigorous program of care. According to Swan, not everyone could carry out Hannah's program because it was so physically demanding that her caregivers had to be physically fit.

Paul Quiroz, Cambrian's director of operations, testified that Cambrian's contract with Harbor was for respite care. Quiroz confirmed the problems in finding adequate caregivers and agreed that Sandra had had the most success doing so. He admitted that due to the nature of the care Hannah required, Cambrian did not have a ready pool of available caregivers to draw on for her. Quiroz had been with Cambrian since 2002 and believed that Hannah's caregivers were excellent and that her condition had improved over the years.

Michele Carlton, a Cambrian employee who did home visits with Hannah for more than four years, testified that Sandra did most of the caregiver training and that Hannah had become stronger and healthier over time.

The trial court found that OAH had jurisdiction to order Harbor to fund Murphy's temporary pay increase, and that the ALJ who conducted the hearing had not abused his discretion. It then entered judgment for Hannah. Harbor contends the trial court erred.

## STANDARD OF REVIEW

At issue in administrative mandate proceedings is whether the agency acted without or in excess of jurisdiction, whether there was a fair hearing, and whether there was a prejudicial abuse of discretion. An abuse of discretion occurs when the agency did not proceed in the manner required by law, its order or decision is not supported by the findings, or the findings are not supported by the evidence. (Code Civ. Proc., § 1094.5, subd. (b).)

In reviewing the hearing officer's decision, the trial court had to exercise its independent judgment on the evidence presented in the administrative hearing and determine whether the weight of that evidence supported the decision, which carries a strong presumption of correctness. We review the trial court's judgment to determine if it is supported by substantial evidence. (*Mason v. Office of Admin. Hearings* (2001) 89 Cal.App.4th 1119, 1130 [108 Cal.Rptr.2d 102].) However, we exercise independent review to the extent we determine legal issues such as the interpretation of statutes and administrative regulations. (*Silver v. Los Angeles County Metropolitan Transportation Authority* (2000) 79 Cal.App.4th 338, 348 [94 Cal.Rptr.2d 287].)

Harbor contends that the evidence is undisputed, and that we therefore exercise independent review of both the legal and factual issues. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 722 [39 Cal.Rptr.3d 189].) Certainly some of the facts are undisputed, but they are merely the framework for our analysis—the who, what, when, and where. As set forth in our analysis, however, the applicability of the various Lanterman Act provisions at issue here turns in part on facts that Harbor hardly acknowledges or discusses—Hannah's medical condition, her need for certain services under the Act, the difficulties in finding and keeping suitable caregivers without the increased pay, the indispensable role played by Mendez in meeting those needs and thereby keeping Hannah at home, and the need to have Murphy assume those duties during Mendez's maternity leave.

It appears to us that these facts are undisputed only in the sense that Harbor's failure to discuss them has waived any sufficiency of the evidence

challenge it might otherwise have mounted. The same is true of the administrative decisions issued in every hearing except for the one at issue on appeal. Because Harbor never challenged those rulings by way of a mandate petition in superior court, its failure to exhaust its judicial remedies makes the factual findings in those rulings final and binding. (*In re Michael K.* (2010) 185 Cal.App.4th 1112, 1126 & fn. 10 [111 Cal.Rptr.3d 187]; *California School Boards Assn. v. State of California* (2009) 171 Cal.App.4th 1183, 1201 [90 Cal.Rptr.3d 501].) As a result, although the substantial evidence standard applies to the trial court's rulings, we accept as true the factual findings made in the previous administrative hearings, and view all the other evidence in the administrative record in the manner most favorable to Hannah.[6]

Our interpretation of the relevant statutes and regulations in light of that evidence is still de novo, even where we determine questions concerning the application of the law to the facts. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960] [independent review exercised when the issue may have practical significance far beyond the case being decided]; *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278] [if the inquiry requires critical consideration in a factual context of legal principles and their underlying values, the question is predominantly legal and we exercise independent review].)

## DISCUSSION

### 1. *The Lanterman Act*

#### A. *Purpose of the Act*

Underlying the Lanterman Act is the Legislature's premise that the state has "a responsibility for persons with developmental disabilities and an obligation to them which it must discharge." (§ 4501.) Given the complexities of providing services and supports to the developmentally disabled, "[a]n

---

[6] We distinguish our holding in this regard from a related issue that was raised below, but which the trial court did not reach: that Harbor's failure to bring administrative mandate actions challenging any of the earlier administrative orders concerning ALJ awards of increased pay and other benefits to some of Hannah's caregivers made those rulings final and binding for collateral estoppel purposes on the issue of OAH's jurisdiction to conduct fair hearings on such issues in the first place.

Harbor contends the doctrine of collateral estoppel does not apply to its jurisdictional challenge because the issues raised at the earlier administrative hearings were not identical to the issue of Murphy's temporary pay raise, and because the doctrine does not apply to legal issues or to challenges based on subject matter jurisdiction. However, even when making these contentions, Harbor does not challenge the factual findings upon which any of the administrative rulings were based. We choose not to reach the collateral estoppel issue.

array of services and supports should be established which is sufficiently complete to meet the needs and choices of each person with developmental disabilities . . . . To the maximum extent feasible, services and supports should be available throughout the state to prevent the dislocation of persons with developmental disabilities from their home communities." (*Ibid.*)[7]

■ To that end, the Act directs that services and supports be available so those with developmental disabilities can approximate the daily living patterns of the nondisabled. Those receiving services (or their parents or guardians) "should be empowered to make choices in all life areas" and should participate in decisions affecting their own lives, including where and with whom they live. (§ 4501.) The mere existence or delivery of services and supports is not enough to show that programs for the developmentally disabled are effective, the Legislature found. Instead, the Legislature intends that agencies serving such persons "produce evidence that their services have resulted in . . . empowerment and in more independent, productive, and normal lives for the persons served." (*Ibid.*)

### B. *Implementation of the Act*

■ DDS is the state agency that has jurisdiction over the laws relating to the care, custody, and treatment of developmentally disabled persons. (§ 4416.) Under the Act, DDS selects nonprofit corporations known as "regional centers" to determine what services should be provided to the developmentally disabled. The regional centers in turn contract with various agencies or individuals to provide those services. (§§ 4620, 4630, 4648, 4651.) DDS oversees and monitors the regional centers for compliance with the Act. (§ 4501.) It also has the authority to see that the regional centers operate in a uniform and cost-effective manner by, among others, developing uniform systems of accounting, budgeting, and reporting (§ 4631, subd. (a)), auditing and paying funds to the regional centers (§ 4780.5), and setting rates for various types of services that the regional centers might provide (§§ 4680, 4690).

As a result, regional centers such as Harbor are responsible for providing each developmentally disabled person with appropriate services while DDS is "basically limited to promoting the cost-effectiveness of the operations of the regional centers, and [its authority] does not extend to the control of the

---

[7] The Act defines "developmental disability" as "a disability that originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual." The term includes mental retardation, cerebral palsy, epilepsy, and other disabling conditions closely related to mental retardation. (§ 4512, subd. (a).) For ease of reference, we will sometimes use the term "disabled" or "disability" as shorthand for developmental disability.

manner in which they provide services or in general operate their programs." (*Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 389–390 [211 Cal.Rptr. 758, 696 P.2d 150].)

### C. *Individual Program Plans*

■ Once a regional center determines that a person is eligible for services, an individual program plan must be developed to determine what services and supports are required, taking into account the needs and preferences of the individual and the family, and promoting independent, productive, and normal lives. The services provided must be effective in meeting the plan's goals, and must also reflect the preferences and choices of the consumer, as well as the cost-effective use of public resources. (§ 4646, subd. (a).)

Individual plans are formulated as part of a collaborative process of individual needs determination by the disabled person and, if appropriate, her parents or guardians. (§ 4646, subd. (b).) The plan must be prepared jointly by the planning team, and decisions concerning the goals, objectives, and services provided shall be made by agreement between the regional center and the disabled person. (§ 4646, subd. (d).) The plan must be reviewed, and modified if necessary, no less than every three years. (§ 4646.5, subd. (b).)

■ Where developmentally disabled children are concerned, the Legislature has mandated even greater flexibility in order to keep such children at home whenever possible. The Legislature "finds and declares that children with developmental disabilities most often have greater opportunities for educational and social growth when they live with their families. The Legislature further finds and declares that the cost of providing necessary services and supports which enable a child with developmental disabilities to live at home is typically equal to or lower than the cost of providing out-of-home placement. The Legislature places a high priority on providing opportunities for children with developmental disabilities to live with their families, when living at home is the preferred objective in the child's individual program plan." (§ 4685, subd. (a).)

The Legislature therefore intends that regional centers respect and support the family's decisions, and "[b]e flexible and creative in meeting the unique and individual needs of families as they evolve over time." (§ 4685, subd. (b)(1), (2).) In order to give disabled children the opportunity to stay at home, DDS and regional centers "shall give a very high priority to the development and expansion of services and supports designed to assist families that are caring for their children at home, when that is the preferred objective in the individual program plan." (§ 4685, subd. (c)(1).)

When a disabled child lives at home, his or her individual plan must include a family support component describing those services needed to help the family keep the child at home when that is in the child's best interests. Regional centers must consider "every possible way" to help families maintain their disabled child at home. (§ 4685, subd. (c)(2).)

### D. *Fair Hearing Rights*

■ Regional centers like Harbor are required to "have an agency fair hearing procedure for resolving conflicts between" themselves and those applying for or receiving services under the Act. (§ 4705, subd. (a).) Except for certain Medicaid-related services, "all issues concerning the rights of persons with developmental disabilities to receive services under [the Lanterman Act] shall be decided under this chapter . . . ." (§ 4706, subd. (a).) "Any applicant for or recipient of services [(or their authorized representative)] who is dissatisfied with any decision or action of the [regional center] which he or she believes to be illegal, discriminatory, or not in the recipient's or applicant's best interests, shall, upon filing a request . . . , be afforded an opportunity for a fair hearing." (§ 4710.5, subd. (a).)

Claimants at these hearings have the rights to be present at all proceedings, present oral and written evidence, appear in person or with counsel or other representatives, confront and cross-examine witnesses, and gain access to records. (§ 4701, subd. (f).)

DDS must contract for the provision of independent hearing officers to conduct these hearings, and those officers must have special training in the law applicable to the developmentally disabled. (§ 4712, subd. (b).) The OAH is DDS's designee for these hearings. (*Hayes v. State Dept. of Developmental Services* (2006) 138 Cal.App.4th 1523, 1531–1532 [42 Cal.Rptr.3d 363].) The hearing officer's decision is final and binding as to administrative proceedings, and the losing party may appeal that decision through an administrative mandate petition in the superior court. (§ 4712.5, subd. (a).)

### E. *DDS's Ratesetting Authority*

■ Regional centers can buy services or supports to fulfill a disabled person's individual plan from individuals or agencies who have gone through vendorization, which is the process of contracting for those services after identifying and selecting those who qualify under certain criteria. (§ 4648, subd. (a)(3)(A).) Regional centers may reimburse approved vendors if a rate of payment for their services has been established by DDS. The director of DDS "shall adopt regulations governing the vendorization process to be utilized by the department, regional centers, vendors and the individual or agency requesting vendorization." (§ 4648, subd. (a)(3)(B).)

These regulations "shall include, but not be limited to: the vendor application process, and the basis for accepting or denying an application; the qualification and requirements for each category of services that may be provided to a regional center consumer through a vendor; requirements for emergency vendorization; procedures for termination of vendorization; [and] the procedure for an individual or agency to appeal any vendorization decision made by the department or regional center." (§ 4648, subd. (a)(3)(C).)

 DDS has ratesetting authority for developmentally disabled persons who reside in community living facilities (residential services) (§ 4680) and for those like Hannah who live at home (nonresidential services) (§ 4690).[8] Section 4690 provides that DDS "shall establish, maintain, and revise, as necessary, an equitable process for setting rates of state payment for nonresidential services purchased by regional centers, and may promulgate regulations establishing program standards, or the process to be used for setting these rates, or both, in order to assure that regional centers may secure high-quality services for developmentally disabled persons from individuals or agencies vendored to provide these services. In developing the rates pursuant to regulation, the director may require vendors to submit program, cost, or other information, as necessary. The director shall take into account the rates paid by other agencies and jurisdictions for comparable services in order to assure that regional center rates are at competitive levels."

 Pursuant to its statutory authority, DDS has promulgated a set of regulations governing the vendorization process, including the application process, audits, rates, and appeals by certain vendors who disagree with a vendorization decision. The regulations assign codes to various types of services, and then establish the maximum pay rate under each service code. (Cal. Code Regs., tit. 17, § 57332.)[9] Respite care, which is what Cambrian's vendor contract with Harbor calls for, receives a maximum hourly rate of $10.71.[10] (Regs., § 57332, subd. (c)(3).) Homemaker services, which Harbor contends is the category best suited to the care Hannah receives from Cambrian, is reimbursed at the vendor's usual and customary rate. (Regs., § 57332, subd. (a)(17).) Regional centers may not reimburse vendors of

[8] We recognize that the Legislature's nomenclature is somewhat confusing. Although nonresidential services sounds like it applies to someone living outside the home, it means the opposite—services provided to someone living at home as opposed to someone living outside the home in some type of residential care facility (residential services).

[9] All further citations to Regulations refer to title 17 of the California Code of Regulations.

[10] Respite care "means intermittent or regularly scheduled temporary nonmedical care and supervision provided in the client's own home, for a regional center client who resides with a family member," and is designed in part to assist family members in maintaining their disabled family member at home. (§ 4690.2, subd. (a)(1).)

nonresidential services unless they have a rate established pursuant to these regulations, and never in an amount above that rate. (Regs., § 57300, subd. (c)(1), (2).)

■ In-home respite service providers can ask DDS to adjust their rates (Regs., § 58420), and can appeal an adverse decision to the director of DDS, who has the final say in such matters (Regs., §§ 58440, subd. (a)(4), 58442, subds. (a), (c)). The same is true for operators of community-based day programs. (Regs., §§ 57920, 57940, subd. (a), 57942, subds. (a), (e).) No such provisions apply to nonresidential services, where the rates are established by negotiation, but may be renegotiated. (Regs., § 57300.)

### 2. OAH Had Jurisdiction over This Dispute

According to Harbor, Sandra's claim for a temporary pay hike for Murphy was nothing more than a vendor pay rate dispute. Because only DDS has authority to set vendor pay rates, and because DDS's regulations allow only vendors to bring pay rate appeals that only the DDS director may decide, Harbor contends that OAH lacked jurisdiction to resolve the dispute. As part of this contention, Harbor asserts that section 4706, subdivision (b), which defines a claimant's fair hearing rights, applies only to the right to receive services, not the right to set the pay scale for those who provide services.

Sandra counters that this is not a vendor pay rate dispute. Instead, she characterizes it as a battle to maintain the services that are required by Harbor's obligation under the Act to be flexible and innovative when providing the services called for by Hannah's extreme disabilities and the unique program Sandra devised to ameliorate their effects. According to Sandra, the Lanterman Act's fair hearing provisions are broadly worded and must be broadly construed to encompass her claim. As set forth below, we agree with Sandra.

■ Our starting point is the rules of statutory construction. Our primary task is to determine the Legislature's intent. We first examine the words used in the statute and give them a plain and commonsense meaning. If the language is clear and unambiguous, there is no need for construction or for resort to indicators of the Legislature's intent. (*Bode v. Los Angeles Metropolitan Medical Center* (2009) 174 Cal.App.4th 1224, 1236–1237 [94 Cal.Rptr.3d 890].)[11] A statute's literal meaning must be aligned with its

---

[11] We notified the parties that we were considering taking judicial notice of the legislative history of three provisions from the Lanterman Act: sections 4691.9, 4706, and 4710.5. We also gave the parties the opportunity to submit briefs addressing whether we should do so. After reviewing the legislative history, we conclude it is silent on the issues before us, and we therefore will not take judicial notice of that history.

purpose. Its meaning may not be determined from a single word or sentence. Instead, the words must be construed in context, and provisions relating to the same subject matter or that are part of the same statutory scheme must be read together and harmonized to the extent possible. (174 Cal.App.4th at pp. 1236–1237.)

We must select a construction that best fits the Legislature's apparent intent; promotes instead of defeats the statute's general purpose; and avoids absurd or unintended consequences. (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 46 [100 Cal.Rptr.2d 627].) The statute cannot be construed in a way that would make its provisions void or ineffective, especially if that would frustrate the underlying legislative purpose. (*Ibid.*)

Because we have not found, and have not been provided with, any administrative interpretations of DDS's vendor appeal regulations, we interpret them under the rules of statutory construction. (*Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1235 [130 Cal.Rptr.2d 209].)

As set forth earlier, Sandra had the right to a fair hearing as to "all issues concerning" Hannah's right to receive services under the Act (§ 4706, subd. (a)), a right that extended to "any decision or action" that she believed was not in Hannah's best interests (§ 4710.5, subd. (a)). Moreover, because Hannah is a minor, Sandra was entitled to a fair hearing if she believed that Harbor was "not offering adequate assistance to enable the family to keep" Hannah at home. (§ 4685, subd. (c)(4).) These are three broadly worded provisions which, as part of a remedial act, we must construe liberally to carry out the purposes underlying the Act. (*Clemente v. Amundson* (1998) 60 Cal.App.4th 1094, 1102 [70 Cal.Rptr.2d 645].)

Nor can we construe them in abstract isolation. Instead, as noted in our Standard of Review, we interpret them in light of the uncontested evidence and administrative findings concerning Hannah's condition and needs. These include that Hannah has a rare condition that requires extraordinary care; the program Sandra has devised for Hannah is both appropriate and beneficial; the program requires caregivers who can perform tasks that fall outside the scope of respite care or home care services, and who therefore require pay rates above the normal range for such services; Cambrian, as Harbor's contractually designated service provider, does not provide such care and is unable to do so at the approved pay rate for the lower level of care it ordinarily offers; without such increased compensation, Sandra would be unable to attract and retain qualified caregivers with whom Hannah can bond; without appropriate caregivers to implement the program Sandra has devised, Hannah would be unable to remain at home; Mendez, as the primary

caregiver, was indispensable to carry out the program, and without her, Hannah's care would be devastated; as a result, Mendez warranted a pay rate well above scale; Murphy was qualified to take over for Mendez during her maternity leave; and the temporary $2.50 per hour pay raise for Murphy was a cost-effective way to meet Hannah's needs.

When these are distilled, they show a severely disabled child with extraordinary needs that can be attended to at home only through the unique program Sandra has devised, and only by a select few who are willing to commit to, and are able to bond with, Hannah. As Sandra points out, her claim for a pay raise for Murphy, and the underlying claim to raise Mendez's pay, are really challenges to Harbor's failure to implement Hannah's individual plan by choosing a generic provider of respite care services to meet Hannah's needs when an entirely different and unique form of care was required. Therefore, Harbor's decision to deny Sandra's request to increase Murphy's pay during the period when she assumed the role of primary caregiver surely raises an "issue[] concerning" Hannah's right to receive services (§ 4706, subd. (a)), reflects a decision that Sandra believed was not in Hannah's best interests (§ 4710.5, subd. (a)), and was based on Sandra's belief that Harbor was not offering adequate assistance to keep Hannah at home (§ 4685, subd. (c)(4)).

In short, the broad language of the provisions prescribing a claimant's fair hearing rights encompass Sandra's claim, particularly in light of the Legislature's mandates to be flexible and creative in meeting a family's unique and individual needs (§ 4685, subd. (b)(2)); give high priority to developing and expanding services to assist families caring for children at home (§ 4685, subd. (c)(1)); and consider "every possible way" to help families keep their disabled children at home (§ 4685, subd. (c)(2)).

Furthermore, the Act's fair hearing procedures are a claimant's exclusive remedy "for issues relating to the provision of services," which must first be exhausted before seeking judicial relief in the superior court. (*Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1462–1463 [66 Cal.Rptr.3d 808].) Adopting Harbor's construction of these provisions would leave claimants in unusual cases such as this, who believe a regional center is not fulfilling its duty to provide necessary services, without a remedy. Instead, the right of parents to advocate for children in Hannah's situation would effectively be converted to an option to be exercised by vendors such as Cambrian, who might have conflicting interests in mind when deciding whether to challenge a decision by their regional center benefactors.

Harbor contends that DDS's authority to set rates and its duty to promote cost-effectiveness trump the Lanterman Act's express mandate to be flexible

and innovative, and to consider every possible way to keep disabled children at home. In other words, according to Harbor, a Lanterman Act recipient's fair hearing rights end where the DDS's ratesetting authority begins. Under the facts of this case, we find this position untenable in light of the Legislature's express directives concerning disabled minors.

Underlying Harbor's contention is the notion that a vendor's pay rate has nothing to do with the provision of services to a developmentally disabled person. In the ordinary case, that might be so. For what we presume to be the vast majority of disabled persons receiving services under the Act, the standard pay rate for providers who are capable of meeting their needs is subject to DDS control. As we read the ratesetting provisions of the Lanterman Act, they are designed to let DDS set rates for the general population of persons receiving services under the Act, thereby promoting uniformity and cost-effectiveness.

But Hannah does not fall into that vast middle. Instead, by dint of both her disabilities and the unique program Sandra was able to devise to meet her needs and keep her at home, Hannah is more of an outlier.[12] That program has allowed Hannah to thrive at home, but it comes at a cost. In order to attract and retain caregivers who are capable of learning and implementing the program and bonding with Hannah, a wage above Cambrian's approved pay rate for respite workers, who are incapable of meeting Hannah's needs, is warranted. Ordering such increased pay is the only way that Hannah can receive the services she needs and to which she is legally entitled, and is fully in line with the high priority the Act places on keeping disabled children at home, and its mandate to be flexible and creative and consider every possible way of doing so.

---

[12] The dissent contends there is no evidence in the record to support our presumption about how rare a case this is, and suggests Hannah's circumstances are not unique because at oral argument of this matter, Harbor's lawyer said that Harbor "deals with many such special needs individuals and every client . . . has unique needs." It is true that during argument, Harbor's lawyer contended that every case was unique, but that ambiguous statement does not fill the gap created by Harbor's failure to (1) contest any of the evidence or findings showing that Hannah requires a primary caregiver who receives more money than Cambrian pays in order to meet her needs and remain at home; (2) contest the evidence and finding that Murphy's temporary pay raise was a cost-effective means of doing so during Mendez's pregnancy leave; or (3) offer either evidence or argument in order to show that Hannah's needs and ability to remain at home could be met without the pay raises ordered by the different ALJ's.

Furthermore, Harbor does not contend, and nothing in the record shows, that pay rate exceptions like those granted to Hannah's caregivers have been requested by or granted to other Canavan sufferers—much less anyone else—receiving support under the Lanterman Act. If there are others—and there may well be—the absence of argument and evidence on that issue, combined with the inferences to be drawn from the evidence and findings concerning how unusual a case this is, leads us to conclude they are rare, and are therefore not unduly burdening the system. If we are wrong on that score, the fault is Harbor's.

As the dissent correctly notes, this decision turns on whether Hannah's pay raise request was a vendor pay rate dispute, as to which the OAH lacks jurisdiction, or a service provision dispute, which falls within OAH's statutory jurisdiction. In some cases, the line between the two is clear. In others, they may overlap. At bottom, this dispute arises from Harbor's decision to contract with Cambrian to provide Hannah's services, even though Cambrian is a provider of in-home respite care, which is inadequate to meet Hannah's unusual needs.[13] In short, if a higher pay rate is needed to provide the care called for by an individualized plan, a regional center's refusal to approve that higher rate goes directly to whether adequate services are being provided.

A good indication that our interpretation is correct comes from Harbor's years-long acquiescence without objection to fair hearings on various issues involving increased pay and benefits for Mendez and other caregivers. Although Harbor might contend that it has now simply realized its error, the notion that this was indeed a dispute about Hannah's right to receive services must have seemed clear enough to convince Harbor that OAH had jurisdiction in these matters.

We acknowledge that the Act's ratesetting provisions include language that could be read to prevent an administrative order such as the one on appeal here. Under those provisions, DDS has been authorized to establish, maintain, and revise a ratesetting process for nonresidential services (§ 4690), and regional centers are permitted to reimburse vendors only if DDS has established a pay rate for their services (§ 4648, subd. (a)(3)(B)).

However, reading these provisions as Harbor insists we must brings them directly in conflict with other provisions that go to the very heart of the Lanterman Act: the provision of individualized services in a creative and flexible manner which, particularly where disabled minors are concerned, allows them to remain at home. Nothing in the Act states that DDS's ratesetting powers and the goals of achieving uniformity and cost-effectiveness are to receive any special priority. By contrast, keeping disabled minors at home has been expressly granted a high priority (§ 4685, subd. (a)), with Harbor and the other regional centers required to consider every possible way to help their families do so (§ 4685, subd. (c)(2)).

Under the rules of statutory interpretation set forth above, accepting Harbor's interpretation would defeat, and not promote, the Lanterman Act's

---

[13] We intend no criticism of Cambrian, which by all accounts has worked hard to accommodate Hannah's needs. The respite care that Cambrian provides is designed to assist family members at home. (See fn. 10, *ante.*) The evidence is uncontroverted that Mendez (and Murphy) did far more than provide the parents with respite.

general purpose by stripping the OAH of the power to order deviations from DDS's established pay rates on an individual basis when warranted by unusual circumstances such as those present here.

Even the ratesetting provisions recognize this need. Section 4648, subdivision (a)(5) states: "In order to ensure the maximum flexibility and availability of appropriate services and supports for persons with developmental disabilities, [DDS] shall establish and maintain an *equitable* system of payment to [service and support providers] identified as necessary to the implementation of a consumer's individual program plan. The system of payment *shall include provision for a rate to ensure that the provider can meet the special needs of consumers and provide quality services and supports in the least restrictive setting as required by law*." (Italics added.)

The DDS regulations cited by Harbor do not alter our analysis. Harbor points to the vendor rate appeal procedures that DDS established for community-based day programs and in-home respite services agencies, and the absence of such a process for nonresidential service providers, as proof that the right to appeal vendor pay rate decisions belongs to only a limited class of vendors. Because of this, Harbor contends, there can be no fair hearings on that issue. An examination of these regulations suggests otherwise.

Regulations section 58420 governs rate appeals for in-home respite services agencies. Under that regulation, rate appeals are permitted for "either anticipated or unanticipated changes." (Regs., § 58420, subd. (a).) Unanticipated changes "shall include mandated service adjustments due to changes in, or additions to, existing statutes, laws or regulations *or court decisions*." (Regs., § 58420, subd. (c), italics added.) Regulations section 57920 applies to rate appeals for community-based day programs, and also provides for appeals in the case of unanticipated changes. However, unanticipated changes for those appeals are limited to "[m]andated service adjustments due to changes in, or additions to, existing statutes, laws, regulations *or court decisions* . . . ." (Regs., § 57920, subd. (c)(1), italics added.)

Harbor has not addressed this language, but we believe it unlikely that the phrase "changes in, or additions to" modifies anything other than "existing statutes, laws, regulations" and therefore does not apply to "court decisions." It is arguable, but unclear, that the phrase "court decisions" also refers to those issued by an ALJ. Regardless, it surely encompasses judgments in administrative mandate actions such as this one, which can come about only if the decision and order from an underlying administrative hearing has been challenged in the superior court. In short, we believe the vendor appeal

regulations anticipate the possibility of fair hearing rulings and subsequent administrative mandate judgments that order the payment of rates above the established scale.

Nor do we make much of the fact that no appeal process is available to providers of nonresidential services. First, Cambrian is a provider of in-home respite services, so it does possess that right. Second, the Legislature charged DDS with adopting regulations that include a vendor's right to appeal a vendorization decision without limitation to certain categories of service providers. (§ 4648, subd. (a)(3)(C).) Therefore, the failure to adopt such a procedure for nonresidential service providers appears inconsistent with DDS's statutory authority, and should be disregarded. (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2].)

Ultimately, however, our analysis turns on our construction of the various fair hearing provisions, and our conclusion that they apply to a case such as this, thereby vesting OAH with jurisdiction to hear this dispute. As already discussed, interpreting DDS's ratesetting authority to preclude an OAH fair hearing under these circumstances conflicts with the Lanterman Act's several provisions which, taken as a whole, place a high priority on using all possible means to keep a disabled child at home. For the same reason, Harbor's construction of DDS's ratesetting regulations conflicts with the Legislature's findings and policies on this topic, and, for the same reasons, we reject it.[14]

### 3. *The Hearing Officer Did Not Abuse His Discretion*

Harbor contends that even if OAH had jurisdiction in this matter, the hearing officer still abused his discretion because section 4691.9 imposed a rate freeze effective June 30, 2008. Under that section "[n]o regional center shall pay an existing service provider, for services where rates are determined *through a negotiation* between the regional center and the provider, a rate higher than the rate in effect on June 30, 2008, unless the increase is required by a contract between the regional center and the vendor that is in effect on June 30, 2008, or the regional center demonstrates that the approval is

---

[14] The dissent contends that our holding will place at peril funding for all disabled persons. Although a legitimate concern, this is not a case where the needs of the one outweigh the needs of the many. Instead, as explained at length in footnote 12, *ante*, Hannah's situation appears to be exceptional, and there is no evidence to suggest that the system is burdened by similar claims.

However, we recognize that claims on the border of our decision, and even some far outside its borders, may be brought as a result of our holding. Our decision is limited to the facts and circumstances of this case. Although there may be others receiving services under the Act for whom relief such as this is warranted, we leave it to other courts to resolve those issues as they arise.

necessary to protect the consumer's health or safety and [DDS] has granted prior written authorization." (§ 4691.9, subd. (a), italics added.)

The increased pay rate for Murphy (and for Mendez as well) was not determined through negotiation between Harbor and Cambrian. Instead, it was the product of an administrative order after Sandra prevailed at her fair hearing and Harbor was ordered to increase Murphy's pay. Therefore, section 4691.9 is inapplicable.[15]

Finally, Harbor contends the ALJ abused his discretion because (1) only vendors can challenge pay rates; (2) the Lanterman Act does not provide a remedy for claimants in a case such as this, because only vendors have standing to appeal rate decisions; (3) Hannah failed to challenge the vendor rate appeal regulations as part of the administrative mandate action, thereby waiving the issue; and (4) Murphy should have made a claim with Cambrian, which was her employer. At bottom, each issue is based on Harbor's contention that the Act's ratesetting provisions, and DDS's rate appeal regulations, precluded Sandra from seeking the temporary pay raise for Murphy. As discussed at length above, we have already rejected that contention.

## DISPOSITION

The judgment is affirmed. Respondents and real parties in interest shall recover their appellate costs.

Flier, J., concurred.

**BIGELOW, P. J.**, Dissenting.—I respectfully dissent.

This appeal presents two issues for resolution. First, whether the Office of Administrative Hearings (OAH) had jurisdiction to order Harbor Regional Center (Harbor) to reimburse Hannah G.,[1] a consumer of disability services, for her out-of-pocket expenditures that supplemented the hourly wage rate paid to her caregiver, Irma Murphy, by Murphy's employer, Cambrian Home Care, a Harbor vendor. Second, whether the OAH had jurisdiction to order Harbor to provide additional funding so that Murphy will receive an increase in her hourly wage from Cambrian. Both issues arise in a context in which Harbor and Cambrian negotiated hourly rates for the services provided by Cambrian, based on the type of service involved, and included those negotiated hourly rates in a vendor contract that was subject to regulation by the State Department of Developmental Services (DDS).

---

[15] Section 4691.9 also indicates that Harbor could have asked DDS for permission to raise the pay scale on the basis that it was necessary to protect Hannah's health or safety.

[1] References to Hannah include her mother, Sandra G.

I am compelled to follow the plain language of the legislation governing this issue, which ensures that each and all of California's recipients of developmental disability services are treated equitably. As a result, I disagree with the majority's conclusion that the OAH had jurisdiction to order Harbor to provide funding so that Murphy alone receives an increased hourly wage from Cambrian. The hourly rate that Harbor pays to Cambrian for services provided is set by their negotiated contract. The order requiring Harbor to pay more to Cambrian, so that Cambrian can give a pay raise solely to Murphy, contravenes the statutory and regulatory procedures for adjusting the hourly rates that regional centers pay to their vendors. Accordingly, I would reverse the trial court's judgment on Harbor's petition for writ of administrative mandate.

*The Lanterman Act*

In 1977, our Legislature enacted comprehensive legislation addressing the subject of services for persons with developmental disabilities. (Stats. 1977, ch. 1252, p. 4283 et seq.) The 1977 legislation established DDS (see Welf. & Inst. Code, § 4400 et seq.),[2] and vested it with "jurisdiction over the execution of the laws relating to the care, custody, and treatment of developmentally disabled persons, as provided in [the Welfare and Institutions Code]" (§ 4416). The 1977 legislation also enacted the Lanterman Developmental Disabilities Services Act (hereafter the Act or Lanterman Act; § 4500 et seq.).[3] With the Lanterman Act, our state has "accept[ed] a responsibility for persons with developmental disabilities and an obligation to them which it must discharge." (§ 4501.)

Under the Lanterman Act, "the state [acting through DDS] shall contract with appropriate agencies to provide fixed points of contact in the community for persons with developmental disabilities and their families, to that end that these persons may have access to the services . . . ." (§ 4620, subd. (a).) These fixed-point agencies are known as "regional centers." Criteria for contracts between DDS and regional centers, and for the operations of regional centers, are subject to specific statutory terms. (§§ 4620–4639.75.)

A. *Services*

Regional centers are responsible for assessing persons for eligibility for services (§§ 4642–4644), and for developing individual program plans (IPP)

---

[2] All further section references are to the Welfare and Institutions Code, unless otherwise designated.

[3] The Lanterman Act is derived from earlier legislation addressing services for persons with developmental disabilities. (See Stats. 1965, ch. 1244, p. 3109 et seq.; Health & Saf. Code, former § 38000 et seq.)

for eligible persons, to be created through a process of individualized needs determination (§ 4646 et seq.). In order to achieve the stated objectives of a person's IPP, the regional center is required to secure needed services and supports. (§ 4648, subd. (a).) A regional center "may, pursuant to vendorization or a contract, purchase services or supports for a consumer from any individual or agency which the regional center and consumer or, where appropriate, his or parents, legal guardian, or conservator, or authorized representatives, determines will best accomplish all or any part of that consumer's [IPP]." (§ 4648, subd. (a)(3).)

When a regional center proposes to take any action concerning services for a person with disabilities, the Lanterman Act provides for an "appeal procedure" (see § 4700 et seq.) that includes a "fair hearing procedure" (see § 4710 et seq.). "Any applicant for or recipient of services . . . who is dissatisfied with any decision or action of [a regional center] which he or she believes to be . . . not in the recipient's or applicant's best interests, shall . . . be afforded an opportunity for a fair hearing" before DDS. (§ 4710.5; see §§ 4710.6–4712.) DDS has designated the OAH as the independent hearing officer for the appeal/fair hearing process. (*Hayes v. California Dept. of Developmental Services* (2006) 138 Cal.App.4th 1523, 1531–1532 [42 Cal.Rptr.3d 363]; see § 4712, subd. (b).) A decision by the OAH is binding as to administrative proceedings, and a losing party may seek review of the decision by petition for writ of administrative mandate to the superior court. (§ 4712.5, subd. (a).)

B. *Rates*

Under the Lanterman Act, regional centers "may, pursuant to vendorization or a contract," purchase services or supports which "will best accomplish all or any part" of an IPP for persons with disabilities, or a "consumer." (§ 4648, subd. (a)(3).) "Vendorization or contracting is the process for identification, selection, and utilization of service vendors or contractors, based on the qualifications and other requirements necessary in order to provide the service." (*Id.*, subd. (a)(3)(A).) DDS is required to "adopt regulations governing the vendorization process to be utilized by the department, regional centers, vendors and the individual or agency requesting vendorization." (§ 4648, subd. (a)(3)(B).) Here, it is undisputed that Harbor has a negotiated vendor contract with Cambrian pursuant to which Cambrian provides services to Hannah, and Harbor pays Cambrian at negotiated hourly rates set in their contract.

Under section 4690of the Lanterman Act, DDS must "establish, maintain, and revise, as necessary, an equitable process for setting rates of state payment for nonresidential services purchased by regional centers . . . ."

Under section 4690.2 of the Lanterman Act, DDS must also "develop program standards and establish, maintain, and revise, as necessary, an equitable process for setting rates of state payment, based upon those standards, for in-home respite services purchased by regional centers . . . ." In other words, when a regional center contracts with a vendor to provide services, the rates that DDS will pay (through the regional center) for the services provided by the vendor is overseen by DDS. Under both sections 4690 and 4690.2, DDS "may promulgate regulations" establishing the process to be used for setting the rates of state payment for services purchased by regional centers.

In accord with its statutory authority, DDS has promulgated regulations governing the vendorization and contract process, including regulations governing the rates for services purchased by regional centers from vendors. These regulations specifically address ratesetting for in-home respite services (see Cal. Code Regs., tit. 17, § 58000 et seq.)[4] and provide: "Each fiscal year, [DDS] shall establish a payment rate for each vendor" (Regs., § 58210, subd. (a).) Vendors may seek to adjust rates according to prescribed procedures, basically by showing specific circumstances justifying an adjustment. (Regs., §§ 58410, 58420.) A vendor may appeal an adverse decision to the deputy director of DDS. (Regs., §§ 58440, 58441.) A vendor may appeal an adverse appeal decision by the Deputy Director of DDS to the Director of DDS. (Reg., § 58442.) "An appeal filed with the Director is the final level of appeal. The decision rendered by the Director . . . shall be deemed final." (Regs., § 58442, subd. ([e]).)

*Analysis*

According to the decision issued by the OAH hearing officer, the current case arose in this context. On several occasions from mid- to late 2008, Hannah "requested that Harbor *provide funding* to increase Mrs. Murphy's wages to $15.00 per hour." (Italics added.) By 2009, Harbor effectively denied Hannah's requests. Hannah initiated the appeal procedure or "fair hearing procedure" with DDS, in the OAH forum. On September 10, 2009, the OAH hearing officer issued a decision granting Hannah's "request to give a pay raise to Irma Gibson Murphy from $12.50 to $15.00 per hour," and ordered Harbor to "provide the *necessary funding* to implement [the pay raise] order." (Italics added.) The decision further ordered Harbor to reimburse Hannah "the amount of supplemental salary paid to Irma Gibson Murphy from June 1, 2009, to [the date of the decision]."

As I understand the statutory scheme, if the events in the current case involve a "vendor rate dispute" between Harbor and Cambrian, the OAH

---

[4] All references to Regulations are to title 17 of the California Code of Regulations.

does not have jurisdiction. But, if the events in the case involve a "service dispute" between Harbor and Hannah, the matter was properly submitted and resolved under the provisions of the Lanterman Act, and accompanying DDS regulations, calling for a "fair hearing" administrative review by the DDS in the OAH forum.

The majority finds this case involves a "service dispute." I find this case involves a "rate dispute" not within the OAH's jurisdiction. Hannah receives services that are provided through a vendor, Cambrian. As such, the rates of reimbursement that Harbor pays to Cambrian are subject to the ratesetting regulations summarized above. Under the regulations summarized above, the *negotiated* rate between Harbor and Cambrian is the maximum rate of reimbursement allowed. (Regs., § 57332, subd. (a).)

There is no denial of services presented here. The type of service that Hannah has received has remained relatively consistent, except for a temporary change in the specific caregiver employee. The matter being raised is purely a rate matter—whether Harbor shall pay one rate ($12.50 per hour) to Cambrian as negotiated between Harbor and Cambrian, or a different, higher rate ($15 per hour). And, as Murphy has now moved on, the crux of the dispute concerns reimbursement of money already expended to pay a higher hourly wage to Murphy.

In the final analysis, the OAH has singled out Hannah from among all the regional center clients, each of whom has unique needs, to receive care at an hourly rate that is higher than the rate negotiated between Harbor and Cambrian, which by law is the maximum rate allowed under the regulations. The majority approves of this procedure because it "presume[s]" the standard pay rate will be sufficient for most of Harbor's special needs clients, but that Hannah "does not fall into that vast middle" and instead "is more of an outlier." (Maj. opn., *ante*, at p. 313.) I am sympathetic to Hannah's plight and recognize that her disease stems from a rare genetic defect, but there is no evidence in the record to support the majority's presumptions. In fact, the attorney for Harbor advised us at oral argument that it deals with *many such special needs individuals and every client of the regional center has unique needs*.

The record also does not support the majority's conclusion that Harbor failed to object to OAH jurisdiction earlier because it must have considered OAH's jurisdiction "clear enough." (Maj. opn., *ante*, at p. 314.) There is no evidence here of Harbor's motive for its legal decision. More importantly, speculation about the reason behind a party's decision to delay contesting jurisdiction provides no legal basis to resolve the issues presented.

In my view, the majority opinion opens the state coffers for an increased pay rate only to one person, which places at risk continued funding for all special needs clients and can cause budgets to be thrown into doubt. The procedures for ratesetting provide predictability and permit budgeting of scarce regional center resources. This is necessary to ensure continued funding for all special needs clients. If the contracted amount of pay required to retain services like those Murphy provided is inadequate, the statutory scheme contemplates a means for changing funding to provide such an increase each fiscal year. (Reg., § 58210, subd. (a).) Vendors can show the need for an adjustment by pointing to specific circumstances. (Regs., §§ 58410, 58420.) This procedure also guarantees that if the contracted amount of pay required to retain services like those provided by Murphy is inadequate, all special needs persons requiring them will receive the benefit of the same increase.

The decision of the majority, in my view, creates precedent that largely eviscerates the cost control purposes of the ratesetting statutes and regulations under the Lanterman Act, to the detriment of all of California's recipients of developmental disability services. Ratesetting to provide the services that meet each client's unique needs must be uniformly decided though an established process in order to be fairly distributed to this state's many special needs clients. The statutory scheme indicates that is to be done by DDS, not on an individualized basis by an administrative law judge.