Filed 2/17/15  Solsby v. Plaza Bank CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DONALD SOLSBY,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>PLAZA BANK,<br><br>    Defendant and Respondent. | G049272<br><br>(Super. Ct. No. 30-2012-00564559-CU-BC-CJC)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Craig L. Griffin, Judge.  Reversed and remanded.

Mahoney & Soll and Paul M. Mahoney, for Plaintiff and Appellant.

Linda Van Winkle Deacon and Stephanie M. Saito, for Defendant and Respondent.

\*          \*          \*

Donald Solsby appeals from a summary judgment entered in favor of defendant Plaza Bank (the Bank) on his claim for breach of contract. Solsby alleged that the Bank, his former employer, breached the terms of his severance agreement when it failed to pay him $165,000 owed in connection with the Bank's "change in control," plus an additional $165,000 owed in connection with the termination of his employment. The Bank, which is insured by the Federal Depository Insurance Corporation (FDIC), successfully moved for summary judgment on the basis that both of the payments Solsby sought were prohibited by FDIC regulations governing the disbursement of "golden parachutes" by "troubled institutions."

Solsby argues the court erred in granting summary judgment because (1) only a bankruptcy court can relieve the Bank of its obligations established by contract; (2) Solsby's right to the payments was "vested," and thus cannot be defeated by FDIC regulations; (3) the severance agreement was enforceable as a "settlement agreement"; (4) the payments owed to him under the severance agreements do not meet the definition of a "golden parachute" under the FDIC regulation; (5) any payment that qualified as a prohibited "golden parachute" was severable from the remainder of the agreement; (6) even if a payment qualified as a "golden parachute" under the FDIC regulation, the Bank nonetheless "had a right" to make it; and (7) the court committed prejudicial error when it sustained objections to portions of the declaration submitted by Solsby's counsel.

In addition to countering those arguments, the Bank contends, for the first time on appeal, that Solsby's claimed right to the "change in control" Bonus was *also* precluded by title 12 United States Code, section 1831o(f)(4) (all further statutory references are to this title of the United States Code unless otherwise stated), because it requires written FDIC approval for any "[B]onus" paid to an executive by an insured institution which is "significantly undercapitalized." However, because this argument was not relied upon by the Bank in its summary judgment motion, we do not address it. (*Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1398-1399.)

2

We reverse the judgment. For the most part, Solsby's contentions are fatally undermined by his refusal to recognize that because the Bank is a member of the FDIC—a relationship which he acknowledges he was personally involved in negotiating—his contractual right to receive these payments was *expressly made subject to FDIC regulations*. Consequently, the Bank's obligation to make those payments was constrained by existing FDIC regulations as a matter of law. Thus, any suggestion that Solsby's contractual rights were somehow immunized from FDIC regulations, or that they were violated by the enforcement of those regulations (arguments 1, 2, and 3), necessarily fails.

However, we do agree with Solsby's more specific assertion that one of the two payments he seeks, the $165,000 "change in control" Bonus, does not meet the statutory definition of a prohibited "golden parachute," because the Bank's obligation to pay the Bonus was not contingent upon the termination of his employment. The trial court erred in concluding otherwise, and that error requires reversal of the summary judgment entered in the Bank's favor.

As for Solsby's additional contention, that even if the disputed payments did qualify as prohibited "golden parachutes" – as appears to be the case with the separate severance compensation payment he seeks – the Bank nonetheless "had a right" to make them, it is legally irrelevant. The issue is whether the Bank was *legally obligated* to make the payments under the terms of the severance agreement, not whether it might have retained some option to do so voluntarily. As we have already noted, under the terms of the parties' agreement, the Bank had no obligation to make any payments prohibited by FDIC regulation.

Finally, Solsby's claim of error in connection with the court's evidentiary ruling is wholly conclusory. He fails to even identify the basis of the court's ruling or cite to its location in the record. Moreover, his assertion of error is unsupported by either citation to authority or any analysis of the purported significance of the excluded

3

evidence.  The claim is consequently waived.  (See *Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 956, ["""When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"""].)

FACTS

Solsby's complaint is brief, alleging in somewhat truncated fashion that in October 2008, the parties entered into a severance agreement, that Solsby performed "all acts, services, covenants and conditions required by said written severance agreement," and that the Bank breached the agreement by failing to pay him in accordance with the terms of the agreement.  He sought damages "in excess of $330,000 according to proof."

In January 2013, the Bank moved for summary judgment on Solsby's "single claim for breach of contract," arguing that FDIC regulations "bar" its compliance with the payment obligations set forth in Solsby's severance agreement.  The Bank argued that because it had already been determined to be a "troubled institution" by the FDIC by the time it entered into Solsby's severance agreement, which qualified as a "golden parachute" under 12 Code of Federal Regulations parts 359.0(b)—359.1(f) (2014), the FDIC's advance written approval was required to even *enter into* the severance agreement, which approval was never obtained.  Thus, the Bank argued that the payment provision of the severance agreement "is void, and Solsby's claim based upon [it] must be denied."

The underlying facts of the parties' relationship—as well as the circumstances surrounding their dispute—were fleshed out in connection with the Bank's motion for summary judgment, and they are essentially undisputed.

By Solsby's own description, he has been "involved in the banking industry for over 45 years.  During his career, he has worked as the Chief Executive Officer and

4

President of various banks." In late 2004, he worked with others (including Lawrence Luckey, who filed a separate lawsuit alleging a similar claim against the Bank), to form the Bank. Solsby testified in his deposition that he was personally involved in negotiations with the FDIC to secure the Bank's membership (and thus its status as an FDIC insured institution). Solsby claimed that he was unaware if it was even possible to open a bank without FDIC insurance, stating, "You can't open without an FDIC insurance certificate." Solsby also explained "there are very strict guidelines that the regulators will approve as to [the] compensation . . . package for any of the approvable positions of senior officers in de novo institutions."

Solsby entered into his own employment agreement with the Bank in January 2006, agreeing to serve as the Bank's president and chief executive officer (CEO), at a salary of $165,000, plus bonuses. Among other provisions, the agreement contained a Section 12, which governed Solsby's rights in the case of a "merger, consolidation or reorganization" of the Bank. (Capitalization and underscoring omitted.) Among other things, Section 12(b) set forth a general rule that Solsby's employment "shall not be terminated due to a Change in Control," a term which is defined in specific ways, but generally amounts to when a change in ownership results in the Bank's current shareholders owning less than 50 percent of its shares. But the provision then stated that "[n]otwithstanding the forgoing, this Agreement and Executive's employment *may be terminated . . . in consideration of the agreement of the Successor Entity or Bank to pay to [Solsby] the Severance Compensation described in Section 12(c) below*." (Italics added.)

Section 12(c) of the agreement then set forth the details of both payments, as follows: "*Except as may be restricted by any then applicable policy of the California Department of Financial Institutions (the 'DFI') or the Federal Deposit Insurance Corporation ('FDIC'), upon any Change in Control*: (1) the surviving or resulting corporation, the transferee of the Bank's assets, or the Bank shall pay to [Solsby] on the

5

effective date of the Change in Control, a lump sum bonus payment equal to twelve (12) months of base salary (the 'Bonus') . . . and (3) *this Agreement and [Solsby's] employment may be terminated* by the Successor Entity (or by Bank effective upon the Change in Control if required to do so under the terms of its agreement with the Successor Entity) *upon execution of a Severance Agreement with [Solsby] providing for the payment to [Solsby] of severance compensation equal to twelve (12) months of his then existing base salary, payable in substantially equal semi-monthly installments over a twelve (12) month period . . . (the 'Severance Compensation'). The Severance Compensation shall be in addition to the Bonus.*"  (Italics added.)

Thus, Section 12 of the employment agreement specified that Solsby would be paid the equivalent of one year's base salary, (the "bonus") if the Bank underwent a "change in control," without regard to the termination of his employment, but would be entitled to an *additional* payment equivalent to a year's base salary (the "severance compensation") *if his employment was terminated* in connection with such a "change in control."

The Bank did not perform as well as Solsby and his colleagues had hoped. Although there is certainly a dispute about whether Solsby bore responsibility for that lackluster performance (not surprisingly, he claims it stemmed entirely from decisions he had opposed), that is not relevant for our purposes.  What is pertinent, and undisputed, is that the Bank was declared by the FDIC to be a "troubled institution" no later than January 2008.

In late 2007 and early 2008, the Bank began seeking additional capital investment.  In October 2008, the Bank entered into a stock purchase agreement with a third party, Carpenter Fund, which all parties agreed qualified as a "change in control" of the Bank.  Moreover, the parties agreed that Solsby's employment would be terminated when that "change in control" became effective; i.e., on the date when the stock purchase transaction Carpenter Fund closed.  These agreements were memorialized in Solsby's

6

"Severance Agreement," which was signed on the same day as the Carpenter Fund stock purchase agreement. The severance agreement essentially incorporated, without change, the provisions of Solsby's employment agreement which entitled him to be paid the "change in control" bonus and the severance compensation, specifying that "[s]ubject to the terms of [his] Employment Agreement: (a) [the Bank] will pay to [Solsby] on the Closing Date a cash lump sum Bonus in the amount of . . . ($165,000.00) . . .; and (b) [the Bank] will also pay to [Solsby] Severance Compensation in the total amount of . . . ($165,000.00), payable in twenty four (24) substantially equal and semi-monthly installments over a twelve (12) month period . . . ."

Solsby continued to work for the Bank until the Carpenter Fund stock purchase transaction closed in June 2009, at which time his employment terminated in accordance with the terms of his severance agreement. The Bank thereafter declined to pay him either the change in control bonus or the severance compensation provided for in his severance agreement.

DISCUSSION

*1. Standard of Review*

Our review of an order granting summary judgment is de novo. "Because a motion for summary judgment raises only questions of law, we independently review the parties' supporting and opposing papers and apply the same standard as the trial court to determine whether there exists a triable issue of material fact. [Citations.] In practical effect, we assume the role of a trial court and apply the same rules and standards governing a trial court's determination of a motion for summary judgment. [Citation.] We liberally construe the evidence in support of the party opposing summary judgment [citation] and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment under the applicable legal

7

standards." (*City of San Diego v. Haas* (2012) 207 Cal.App.4th 472, 487.) The de novo standard also applies to issues of statutory and regulatory interpretation. (See *Bruns v. E-Commerce Exchange, Inc*. (2011) 51 Cal.4th 717, 724 ["[s]tatutory interpretation is a question of law that we review de novo"]; *Harbor Regional Center v. Office of Administrative Hearings* (2012) 210 Cal.App.4th 293, 305 ["Our interpretation of the relevant statutes and regulations . . . is still de novo, even where we determine questions concerning the application of the law to the facts"].)

*2. Solsby's Claim That the FDIC Directed "a Breach of Contract" is Specious*

An over-arching theme in Solsby's opening brief (expressed as a "preliminary statement," although not developed into a specific claim of error), is that allowing the FDIC to dictate whether or not he receives his severance payment is "wrong and dangerous" because it impairs the right of parties to enforce their contracts and allows "the federal government, without intervening in a lawsuit, [to] tell a bank to breach a contract with an employee." He even invites this court, without the benefit of *any* comparative analysis, to view his claimed right to the payments outlined in his Severance Agreement as the functional equivalent of the court's own judicial pension system, and suggests that "if judges' pensions were impaired [they] would argue fiercely that their pensions could not be touched because of the contracts clause of the United States and California Constitutions." The clear implication behind this comparison is the suggestion that this court's analysis of his contract claim would be colored by the panel members' self-interest in preserving their own judicial pensions. Not only is the implication both improper and insulting, the comparison is legally specious.

The FDIC's power to regulate Solsby's contractual right to payment is not derived from some arbitrary governmental prerogative to impose its will on retirement provisions whenever and however it chooses. This is not a case, as Solsby seems to be implying, where a shadowy government regulator has emerged from nowhere and

8

curtailed the parties' ability to enter into and enforce their agreement in a manner they could not have anticipated. Here, the FDIC was *invited* to regulate many aspects of the Bank's financial dealings when the Bank signed on as a member of the FDIC.

More significantly, Solsby specifically agreed in his original employment agreement that the Bank's obligation to pay him a "change in control" bonus and severance compensation would be "restricted by any then applicable policy . . . of the [FDIC]." And he later expressly acknowledged in his severance agreement that his bonus and severance compensation remained "[s]ubject to the terms of [his] Employment Agreement." Consequently, Solsby specifically *agreed* that the Bank would be adhering to all FDIC restrictions in effect at the time any such payments became due, and thus those restrictions were effectively *incorporated into his contract*. It is well-settled that "'"'all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated."'"' (*Swenson v. File* (1970) 3 Cal.3d 389, 393.)

The fact that Solsby's agreement with the Bank explicitly acknowledged the binding effect of FDIC regulations means there is no need to rely on a *presumption* that the parties had the FDIC's regulatory authority in mind when they entered into their agreement. Rather, it is indisputable that the parties intended the Bank's payment obligations would be restricted by the FDIC policies in effect at the time those payments became due. There is simply nothing in this record to support Solsby's notion that the FDIC's supposed regulatory intrusion impaired his vested contractual rights. The suggestion is wholly unfounded.

Consequently, the only real issue in this appeal is whether the trial court properly applied those regulations in determining that both Solsby's "change in control" Bonus and his Severance Compensation qualified as "golden parachute" payments under the applicable FDIC regulations. We conclude that while the court was correct in

9

determining the "Severance Compensation" qualified as a "golden parachute," it was incorrect in applying that label to the "change in control" Bonus. The Bank's liability for that Bonus was never made contingent upon the termination of Solsby's employment, and thus it did not qualify under the statutory definition of a FDIC "golden parachute."

*3. The FDIC's "Golden Parachute" Rule*

Section 1828 (k)(4)(A), offers the general definition of what qualifies as a potentially prohibited "golden parachute" payment by an FDIC insured institution: "In general. The term 'golden parachute payment' means any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party pursuant to an obligation of such institution or covered company that-- [¶] **(i)** is contingent on the termination of such party's affiliation with the institution or covered company; and [¶] **(ii)** is received on or after the date on which-- [¶] . . . [¶] **(III)** the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition . . . ."

An "institution affiliated party" (IAP), is defined as "any director, officer, employee, or controlling stockholder . . . of, or agent for, any insured depository institution." (§ 1813(u)(1).) There is no dispute that Solsby meets the definition of an IAP. It is also undisputed that the Bank was declared by the FDIC to be in "troubled condition" in January 2008, before the date Solsby was scheduled to receive both his "change in control" Bonus and his Severance Compensation. Thus, under section 1828(k)(4)(A), these payments would qualify as "golden parachutes" if they are "contingent on the termination of [Solsby's] affiliation" with the Bank.

However, the FDIC's own regulation arguably expands that "golden parachute" definition somewhat. Title 12 Code of Federal Regulations part 359.1(f) (2014) states that "(1) The term golden parachute payment means any payment (or any

agreement to make any payment) in the nature of compensation by any insured depository institution or an affiliated depository institution holding company for the benefit of any current or former IAP pursuant to an obligation of such institution or holding company that:  [¶] **(i)**  Is contingent on, *or by its terms is payable on or after*, the termination of such party's primary employment or affiliation with the institution or holding company; and [¶] **(ii)**  Is received on or after . . . [¶] . . . [¶] **(C)** A determination . . . that the insured depository institution or depository institution holding company is in a troubled condition . . . ."  (Italics added.)  It is this additional language included in the regulation which the Bank primarily relies upon in arguing the two payments provided for in Solsby's severance agreement qualify as "golden parachutes."

When a payment meets the definition of a "golden parachute," then FDIC regulations generally prohibit its disbursement.  (12 C.F.R. §§ 359.2, 359.4 (2014).) However, as also explained in the regulations, such payments can be made if expressly approved by the FDIC, upon the request of either the institution or the IAP:  "An insured depository institution or depository institution holding company may agree to make or may make a golden parachute payment if and to the extent that: [¶] **(1)** The appropriate federal banking agency, with the written concurrence of the Corporation, determines that such a payment or agreement is permissible; or [¶]  **(2)** Such an agreement is made in order to hire a person to become an IAP either at a time when the insured depository institution or depository institution holding company satisfies or in an effort to prevent it from imminently satisfying any of the criteria set forth in § 359.1(f)(1)(ii), and the institution's appropriate federal banking agency and the Corporation consent in writing to the amount and terms of the golden parachute payment. . . .;  Or [¶] **(3)** Such a payment is made pursuant to an agreement which provides for a reasonable severance payment, not to exceed twelve months salary, to an IAP in the event of a change in control of the insured depository institution; provided, however, that an insured depository institution or depository institution holding company shall obtain the consent of the appropriate federal

11

banking agency prior to making such a payment . . . ." (12 C.F.R. § 359.4(a)(1) – (3) (2014).)

The regulation further provides that "[a]n insured depository institution, depository institution holding company or IAP making a request pursuant to paragraphs (a)(1) through (3) of this section shall demonstrate that it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe, at the time such payment is proposed to be made, that: [¶] . . . [¶] **(ii)** The IAP is substantially responsible for . . . the troubled condition, as defined by applicable regulations of the appropriate federal banking agency, of the insured depository institution, depository institution holding company or any insured depository institution subsidiary of such holding company. . . ." (12 C.F.R. § 359.4(a)(4) (2014).)

Finally, "In making a determination [whether there is reasonable basis to believe the IAP is substantially responsible for the institution's troubled condition] the appropriate federal banking agency and the Corporation may consider: [¶] **(1)** Whether, and to what degree, the IAP was in a position of managerial or fiduciary responsibility; [¶] **(2)** The length of time the IAP was affiliated with the insured depository institution or depository institution holding company, and the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment; and [¶] **(3)** Any other factors or circumstances which would indicate that the proposed payment would be contrary to the intent of section 18(k) of the Act or this part." (12 C.F.R. § 359.4 (b)(1) – (3) (2014).)

In this case, there is nothing in the record suggesting that either the Bank or Solsby ever requested that the FDIC approve disbursement of the payments provided for in Solsby's severance agreement. And because it is the FDIC, and not the courts, which has been given this discretion to approve "golden parachute" payments, our assessment

12

of whether the FDIC would have (or should have) approved these payments to Solsby, if requested to do so, is immaterial.

*4. Solsby's "Severance Compensation" Payment Qualifies as a "Golden Parachute"*

We have no difficulty concluding the trial court correctly determined that Solsby's severance compensation met the statutory definition of an FDIC "golden parachute." First, as we have already noted, there is no dispute that Solsby qualified as an IAP of the Bank, and no dispute that the Bank had been declared by the FDIC to be in "troubled condition" by January 2008, long before the payment became due.

Thus, the only remaining question to be addressed in determining whether the severance compensation qualified as an FDIC "golden parachute" is whether it "is contingent on the termination of [Solby's] affiliation with the institution or covered company . . . ." (§ 1828(k)(4)(A)(i).) And the answer to that question is clearly yes.

The Bank's obligation to pay Solsby's severance compensation was initially provided for in Section 12 of his employment agreement, as part of an exception to the general rule that his employment "shall not be terminated due to a Change of Control." The exception provided that the Bank "may" nonetheless terminate Solsby's employment "effective upon a Change in Control . . . *in consideration of the agreement . . . to pay [Solsby] the Severance Compensation . . . .*" (Italics added.) Thus, from the inception of Solsby's employment, his right to receive the Severance Compensation payment was always contingent upon the Bank's decision to *terminate his employment* in connection with a "change in control." And when the Severance Compensation obligation was later restated as part of Solsby's severance agreement, it was not altered in any way. To the contrary, the severance agreement expressly provides that the Bank's obligation to pay the Severance Compensation is "[s]ubject to the terms of [his] Employment Agreement." Consequently, the Severance Compensation which was originally promised to Solsby under the terms of his employment agreement and was

13

then carried forward into his severance agreement, remained tied to the Bank's decision to terminate his employment. The payment thus met the FDIC's definition of a "golden parachute."

And of course, because one of the terms of Solsby's employment agreement, which carried over into the severance agreement, was that the Bank's obligation to pay either Solsby's Severance Compensation or his "change in control" Bonus was subject to "restrict[ion] by any then applicable policy of the . . . ("FDIC") . . . ," those FDIC restrictions were at all times *part of the agreement*. Thus, the FDIC's prohibition against making a "golden parachute" payment absent its express approval must be treated as though it had been *written into* the parties' contract, and we reject Solsby's repeated assertions that adherence to this regulation would illegally impair his right to payment in accordance the contract terms.

Consequently, because the Bank's payment of the Severance Compensation to Solsby would qualify as a "golden parachute" under FDIC regulations, we conclude the trial court correctly ruled that in the absence of the FDIC's explicit approval, the Bank had no contractual obligation to make that payment.

Solsby's arguments to the contrary are unavailing. We have no quibble with his assertion that it is the *substance* of the parties' agreement, rather than its *label*, which controls the parties' obligations, and it is for that reason we are unswayed by his effort to relabel the severance agreement as "just the opposite" of a severance agreement. Even if it were true, as Solsby claims, that the underlying goal of the agreement was actually to ensure he would "stay on board so that the Stock Purchase Agreement could go forward," rather than to force his resignation, that does not change its *substance* – which includes the provision stating that the Bank's obligation to pay the Severance Compensation is "[s]ubject to the terms of [his] Employment Agreement." Because those terms include both the specification of the payment's contingent nature as well as the Bank's required adherence to applicable FDIC policy in making it, it is the substance

14

of the severance agreement, not its label, which dooms Solsby's claim to recover the severance compensation in the absence of FDIC approval.

Nor does the fact this severance agreement contains distinct provisions normally associated with settlement agreements, such as mutual releases, change our analysis. The FDIC regulation prohibiting the payment of "golden parachutes" without its approval contains no exception for cases in which those provisions are included in "settlement agreements" and Solsby cites no authority suggesting it does. And it should go without saying that such an exception could easily be used to nullify the FDIC's authority to regulate "golden parachute" payments *in its entirety*.

And of course, Solsby's assertion that his right to the severance compensation is "vested" adds nothing. The only contractual right that could have "vested" is the one set forth in the agreement, which as we have already explained, was made subject to FDIC restrictions. Pursuant to those restrictions, Solsby has no enforceable right to payment of the Severance Compensation absent FDIC approval.

Finally, Solsby also attacks the significance of a FDIC ruling set forth in the Federal Register (61 Fed.Reg. 5926 (Feb. 15, 1996)), to the effect that once an individual's" golden parachute" payment has been prohibited, it is prohibited forever. He argues this ruling should be disregarded, because it was never incorporated into a formal regulation and is thus no more binding on the courts than "*Vanity Fair, Rolling Stone, or Gentlemen's Quarterly*." However, Solsby is simply ignoring the well-settled principal that courts will defer to an administrative agency's interpretation of its own regulations. (*Pacific Legal Foundation v. Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 111 [courts defer to an agency's interpretation of its own regulations because of its expertise in that area of the law]; *Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 965 [courts "generally defer to an agency's interpretation where the agency '"possess[es] special familiarity with satellite legal and regulatory issues"'"].) Thus, absent some argument explaining why the ruling set forth in the Federal register (61 Fed.Reg. 5926

15

(Feb. 15, 1996)) is an erroneous application of the FDIC "golden parachute" regulations (and Solsby offers none), we presume it is correct.

5.  *Solsby's Change in Control "Bonus" Does not Qualify as a "Golden Parachute."*

By contrast to the severance compensation payment, Solsby's right to the separate "change in control" bonus was never made dependent upon the termination of his employment with the Bank.  Instead, under the terms of Solsby's employment agreement, the Bank (or its successor) was obligated to pay Solsby this bonus if the Bank experienced a defined "change in control," even though the agreement also specified, as a general matter, that his employment "shall not be terminated due to a Change in Control." The only exception to this general rule prohibiting termination of Solsby's employment in connection with a "change in control" allowed the Bank (or its successor) to do so on condition that it agreed to pay him the *additional* severance compensation also provided for in the agreement.  Thus, it is only the severance compensation, not the bonus payment, which was contractually dependent upon the *additional* circumstance of Solsby's employment being terminated in connection with a change in control.

And again, the parties' severance agreement did nothing to change the terms of the Bank's payment obligation as outlined in Solsby's employment agreement. Rather, it expressly confirmed that the Bank's obligation to pay the "change in control" Bonus remained "[s]ubject to the terms of the Employment Agreement," which would include the provision specifying that the "change in control" bonus would be owed to Solsby without regard to any alteration in his employment.

And while the Bank is correct in asserting that the severance agreement requires Solsby to resign his employment effective on the "Closing Date" – which is the same date on which his bonus was also required to be paid – that confluence of timing does not, in and of itself, demonstrate those two obligations are legally interdependent.

16

What is arguably most significant about the severance agreement is its explicit acknowledgment that the Bank's underlying stock sale transaction with Carpenter Fund *qualified as a "change in control"* over the Bank, which would then trigger both the Bank's obligation to pay Solsby's "change in control" bonus and its related, but separate, option to terminate his employment in exchange for its payment of the severance compensation. Thus, the "Closing Date" identified in the severance agreement is simply defined as the date on which that underlying stock sale transaction is consummated; i.e., as the "closing of the transactions contemplated by that certain Stock Purchase Agreement." Consequently, the fact that both the termination of Solsby's employment and the Bank's obligation to pay his "change in control" Bonus were set to take effect on that same "Closing Date" implies nothing more than that each of these distinct obligations was separately tied to the consummation of that stock sale transaction.

Moreover, any temptation to simply infer a general rule that all of the Bank's payment obligations in the severance agreement were intended to be conditioned on Solsby's full performance of his obligations thereunder, including his resignation from employment, is rather squarely rebutted by the agreement's inclusion of a broad severability clause providing that in the event "any provision" of the agreement is determined to be "invalid, unenforceable or void for any reason, and cannot be saved by a narrowing construction," it "shall be severed from the remaining provisions of this Agreement and shall not affect the validity and enforceability of such remaining provisions." In the face of this language, which implies that no single provision of the severance agreement should be viewed as key to the enforceability of any other provision, we cannot presume a link which is not stated.

Based on the foregoing, we conclude that Solsby's "change in control" bonus does not qualify as a "golden parachute" under the definition set forth in

section 1828(k)(4)(A)(i), because it was never made "contingent on the termination of [his] affiliation with the institution."

On the other hand, as we have already acknowledged, the FDIC's own *regulation* arguably expanded that "golden parachute" definition somewhat. Title 12 Code of Federal Regulations part 359.1(f) (2014) states that "[t]he term golden parachute payment" refers to any payment which "**(i)**  Is contingent on, *or by its terms is payable on or after*, the termination of such party's primary employment or affiliation with the institution or holding company; and [¶] **(ii)**  Is received on or after . . . .  [¶] . . . [¶]  **(C)** A determination . . . that the insured depository institution or depository institution holding company is in a troubled condition . . . ."  (Italics added.)  It is this distinct language, found in the regulation but *not the statute*, which the Bank relies upon in arguing that Solsby's "change in control" Bonus – which, after all, was scheduled to be paid on the same date his employment was terminated in accordance with the Severance Agreement – qualifies as a "golden parachute."  While we do find some surface appeal in the argument, we reject it.

First, we note that as a rule, any inconsistency between the language of a statute and the language of a regulation must be resolved in favor of the statute.  This is true under both state and federal law.  (*California School Bds. Assn. v. State Bd. of Education* (2010) 191 Cal.App.4th 530, 544 ["an agency does not have discretion to promulgate regulations that are inconsistent with the governing statute, alter or amend the statute, or enlarge its scope"]; *Chevron, U.S.A., Inc. v. NRDC, Inc.* (1984) 467 U.S. 837, 842-843 [104 S.Ct. 2778, 81 L.Ed.2d 694]["If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"].)  Thus, we would be required to reject any regulation which expands the definition of a "golden parachute" beyond the one set forth by Congress in the applicable statute.

18

But we need not do so in this case, as we conclude the regulation's additional reference to a payment which "*by its terms* is payable on or after, the termination of . . . employment" (12 C.F.R. 359.1(f)(1)(i) (2014), italics added) does not imply any intention to go beyond the statute's reference to payments that are "contingent" on termination. Instead, the regulation's reference to a payment which "by its terms" is payable on or after termination must be construed literally; i.e., as applying to those obligations which specify, *as a term*, that payment will not be made until "on or after" employment termination, whenever that might be. Under this interpretation, it is not sufficient to simply compare *the date* of employment termination with *the date* a particular payment obligation becomes due, as the Bank has done in this case. Instead, the Bank would be required to demonstrate that the termination of employment was *a necessary prerequisite to* the purported "golden parachute" payment obligation, which it has failed to do in connection with Solsby's "change in control" bonus.

*6. The Bank did not Rely on its Undercapitalized Status as a Separate Basis for Summary Judgment*

In addition to renewing its "golden parachute" argument made in the trial court, the Bank also relies on section 1831o(f)(4) as a separate basis for excusing payment of Solsby's "change in control" bonus. Section 1831o(f)(4) requires written FDIC approval for any "bonus" paid to an executive by an insured institution which is "significantly undercapitalized." However, because this argument was not relied upon by the Bank in its summary judgment motion, we do not address it. (*Bank of America, N.A. v. Roberts, supra,* 217 Cal.App.4th 1398-1399.)

Consequently, because we conclude the Bank has failed to demonstrate that Solsby's right to payment of the "change in control" bonus specified in his severance agreement qualified as a "golden parachute" under the definition set forth in section 1828, subdivision (k)(4)(A)(i) – which was the sole rationale underlying the

Bank's motion for summary judgment – we conclude the court erred in granting summary judgment in its favor on Solsby's single cause of action for breach of contract.

DISPOSITION

The judgment in favor of the Bank is reversed, and the case is remanded to the trial court for further proceedings.  Solsby is to recover his costs on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

ARONSON, J.

THOMPSON, J.

20