Filed 2/17/15  Luckey v. Plaza Bank CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LAWRENCE L. LUCKEY, | |
| Plaintiff and Appellant, | G049259 |
| v. | (Super. Ct. No. 30-2012-00564572-CU-BC-CJC) |
| PLAZA BANK, | |
| Defendant and Respondent. | O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, John C. Gastelum, Judge.  Affirmed.

Mahoney & Soll and Paul M. Mahoney for Plaintiff and Appellant.

Linda Van Winkle Deacon and Stephanie M. Saito for Defendant and Respondent.

\*         \*         \*

Lawrence L. Luckey appeals from a summary judgment entered in favor of defendant Plaza Bank (the Bank) on his complaint for breach of contract. Luckey alleged that the Bank, his former employer, breached the terms of his employment agreement when it failed to pay him a "change in control" bonus and severance compensation, in connection with a change in primary ownership of the Bank and the termination of his employment. The Bank, which is insured by the Federal Depository Insurance Corporation (FDIC), successfully moved for summary judgment on the basis that the payments Luckey sought were prohibited by FDIC regulations governing the payment of "golden parachutes" by "troubled institutions."

Luckey argues the court erred in granting summary judgment because (1) only a bankruptcy court can relieve the Bank of its obligations established by contract; (2) the payments owed to him under the employment agreement do not meet the definition of a "golden parachute" under the FDIC regulation; (3) any payment that qualified as a prohibited "golden parachute" was severable from the remainder of the agreement; and (4) even if a payment qualified as a "golden parachute" under the FDIC regulation, the Bank nonetheless "had a right" to make it and the payment would not be prohibited by the FDIC.

In addition to countering those arguments, the Bank renews its contention that Luckey's claimed right to the "change in control" bonus was also precluded by title 12 United States Code section 1831o(f)(4) (all further statutory references are to this title of the United States Code unless otherwise stated), which requires written FDIC approval for any "bonus" paid to an executive by an insured institution which is "significantly undercapitalized." Because it concluded that both payments were prohibited by the "golden parachute" rule, the trial court did not address this separate contention.

We affirm the judgment. Luckey's first argument is fatally undermined by the fact that his employment agreement specifically provided that the Bank's obligation to make the disputed payments was subject to "restrict[ion] by any then applicable policy

2

of the [FDIC]." Thus, the Bank's required compliance with those FDIC policies was effectively incorporated into the agreement and cannot be asserted as a basis for any claimed breach.

As for Luckey's additional claim, that even if the disputed payments did qualify as prohibited "golden parachutes," the Bank nonetheless "had a right" to make them, it is legally irrelevant. The issue is whether the Bank was *legally obligated* to make the payments under the terms of the employment agreement, not whether it might have retained some option to do so voluntarily. As we have already noted, under the terms of the agreement, the Bank had no obligation to make any payments prohibited by FDIC regulation.

On the other hand, we do agree with Luckey's more specific assertion that one of the two payments he seeks the "change in control" bonus, does not meet the statutory definition of a prohibited "golden parachute," because the Bank's obligation to pay the bonus was not contingent upon the termination of his employment. The trial court erred in concluding otherwise.

However, we also agree with the Bank's alternative claim, based on section 1831o(f)(4), that it was relieved of any obligation to pay Luckey's "change in control" bonus because it had been declared "significantly undercapitalized" by the FDIC in May 2009. The Bank raised the undercapitalization claim in its motion for summary judgment in Luckey's action, but his opposition to the motion did not respond to it. On appeal, the Bank has again asserted the significant undercapitalization argument and again Luckey failed to respond to the contention. Because we find the undercapitalization claim has merit, the Bank was under no obligation to make either of the two payments sought by Luckey in this case. Thus, the trial court's grant of summary judgment was proper.

FACTS

Luckey's complaint is brief, alleging in somewhat truncated fashion that in January 2006, the parties entered into an employment agreement, that Luckey performed "all acts, services, covenants and conditions required by said written employment contract," and that the Bank breached the agreement by failing to pay him in accordance with the terms of the agreement. He sought damages "in excess of $310,000, according to proof."

In March 2013, the Bank moved for summary judgment on Luckey's "single claim for breach of contract," arguing that (1) Luckey's employment agreement had been superseded by a 2009 "transition agreement" which contained no provision for the claimed payments; (2) both payments constituted prohibited "golden parachutes" under applicable FDIC regulations; (3) its obligation to pay Luckey the severance compensation payment was conditioned on his execution of a severance agreement, which he did not do; and (4) payment of the "change in control" bonus was prohibited by statute because the Bank was "significantly undercapitalized" as of May 2009. The trial court rejected the Bank's assertion that Luckey's "transition agreement" had superseded his employment agreement, and the Bank does not renew that assertion on appeal. We consequently do not address it.

The underlying facts of the parties' relationship – as well as the circumstances surrounding their dispute – were fleshed out in connection with the Bank's motion for summary judgment, and they are essentially undisputed.

By Luckey's own description, he has been "involved in the banking industry for approximately 40 years." During his career, he has worked for various banks in different capacities, including chief executive officer of one bank, and chief operating officer of another. In 2004, he worked with others (including Donald Solsby, who filed a separate lawsuit alleging a similar claim against the Bank), to form the Bank.

4

As part of the process of forming the Bank, Luckey and Solsby submitted an application and an initial business plan to the FDIC for approval. And by opening as an FDIC insured institution, the Bank agreed to be bound by FDIC rules and regulations. Luckey entered into his own employment agreement with the Bank in January 2006, agreeing to serve as the Bank's executive vice-president and chief operating officer (COO), at a salary of $155,000 per year, plus bonuses. Among other provisions, the agreement contained a Section 12, which governed Luckey's rights in the case of a "merger, consolidation or reorganization" of the Bank. (Capitalization omitted.) Section 12(b) first set forth the general rule that Luckey's employment "shall not be terminated due to a Change in Control," a term which is defined in specific ways, but generally amounts to when a change in ownership results in the Bank's current shareholders owning less than 50 percent of its shares. But the provision then stated that "[n]otwithstanding the forgoing, this Agreement and Executive's employment *may be terminated . . . in consideration of the agreement of the Successor Entity or Bank to pay to [Luckey] the Severance Compensation described in Section 12(c) below.*" (Italics added.)

Section 12(c) of the agreement then set forth the details of both payments, as follows: "*Except as may be restricted by any then applicable policy of the California Department of Financial Institutions (the 'DFI') or the Federal Deposit Insurance Corporation ('FDIC'), upon any Change in Control*: (1) the surviving or resulting corporation, the transferee of the Bank's assets, or the Bank shall pay to [Luckey] on the effective date of the Change in Control, a lump sum bonus payment equal to twelve (12) months of base salary (the "Bonus") . . . and (3) *this Agreement and [Luckey's] employment may be terminated* by the Successor Entity (or by Bank effective upon the Change in Control if required to do so under the terms of its agreement with the Successor Entity) *upon execution of a Severance Agreement with [Luckey] providing for the payment to [Luckey] of severance compensation equal to twelve (12) months of his*

5

*then existing base salary, payable in substantially equal semi-monthly installments over a twelve (12) month period . . . (the 'Severance Compensation'). The Severance Compensation shall be in addition to the Bonus.*" (Italics added.)

Thus, Section 12 of the employment agreement specified that Luckey would be paid the equivalent of one year's base salary (the "bonus") if the Bank underwent a "change in control," without regard to the termination of his employment, but would be entitled to an *additional* payment equivalent to a year's base salary (the "severance compensation") *if his employment was terminated* in connection with such a "change in control."

The Bank did not perform as well as Luckey and his colleagues had hoped. Although there is certainly a dispute about whether Luckey bore responsibility for that lackluster performance (he claims it stemmed entirely from decisions he had opposed, while the Bank contends he bore significant responsibility for its travails), that is not a relevant dispute for our purposes. What is relevant, and undisputed, is that the Bank was in some significant financial distress by May 2009, and its board of directors (including Luckey) consented to issuance of a "Cease and Desist" order by the FDIC. And on May 28, 2009, the FDIC notified the Bank that it was "significantly undercapitalized."

Beginning in late 2007 and early 2008, the Bank began seeking additional capital investment. In October 2008, the Bank entered into a stock purchase agreement with a third party, Carpenter Fund, which for purposes of the Bank's summary judgment motion, all parties agreed qualified as a "change in control" of the Bank. Moreover, it is undisputed Luckey's employment as the Bank's senior vice-president and COO was to be terminated when that change in control became effective; i.e., on the date when the Carpenter Fund stock purchase transaction closed. However, the parties never executed a severance agreement in connection with the change in control, as provided for in Luckey's employment agreement.

6

The Carpenter Fund stock sale transaction closed on June 5, 2009, resulting in the infusion of nearly $18 million in additional capital into the Bank.

On the same date the stock sale transaction closed, and thus the "change in control" took effect, Luckey entered into a "transition agreement" with the Bank, which provided for his employment as a "Transition Officer" for a "limited duration," in exchange for compensation at a rate equal to his prior salary of $155,000 per year. The transition agreement contained a boilerplate integration clause, reflecting that it "supersedes any prior representations or agreements," but did not specify whether that would extend to prior representations or agreements unrelated to the terms of the transition agreement. There was no evidence that either Luckey or Robert Feldhake, the person who executed the transition agreement on behalf of the Bank, intended that the agreement would supersede Luckey's employment agreement. The transition agreement made no reference to the employment agreement, and was silent regarding his entitlement to the "change in control" bonus and the severance compensation provided for in that agreement.

Luckey continued to work for the Bank under the terms of the transition agreement, until August 2009. The Bank refused to pay him either the "change in control" bonus or the severance compensation provided for in his employment agreement.

DISCUSSION

*1. Standard of Review*

Our review of an order granting summary judgment is de novo. "Because a motion for summary judgment raises only questions of law, we independently review the parties' supporting and opposing papers and apply the same standard as the trial court to determine whether there exists a triable issue of material fact. [Citations.] In practical

7

effect, we assume the role of a trial court and apply the same rules and standards governing a trial court's determination of a motion for summary judgment. [Citation.] We liberally construe the evidence in support of the party opposing summary judgment [citation] and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment under the applicable legal standards." (*City of San Diego v. Haas* (2012) 207 Cal.App.4th 472, 487.) The de novo standard also applies to issues of statutory and regulatory interpretation. (See *Bruns v. E-Commerce Exchange, Inc*. (2011) 51 Cal.4th 717, 724 ["[s]tatutory interpretation is a question of law that we review de novo"]; *Harbor Regional Center v. Office of Administrative Hearings* (2012) 210 Cal.App.4th 293, 305 ["Our interpretation of the relevant statutes and regulations . . . is still de novo, even where we determine questions concerning the application of the law to the facts"].)

*2. Luckey's Claim That the FDIC Directed "a Breach of Contract" is Specious*

The trial court's order granting summary judgment in this case was based on the application of the FDIC's "golden parachute" rule, which prohibits an insured institution from making certain payments to insiders if it is in "troubled condition."

Hence, an overarching theme in Luckey's opening brief (expressed as a "preliminary statement," although not developed into a specific claim of error), is that allowing the FDIC to dictate whether or not he receives the bonus and severance compensation set forth in his employment agreement is "absurd" and "dangerous" because it impairs the right of parties to enforce their contracts and allows "the federal government, without intervening in a lawsuit, [to] tell a bank to breach a contract with an employee." He even invites this court, without the benefit of *any* comparative analysis, to view his claimed right to the payments outlined in his employment agreement as the functional equivalent of the court's own judicial pension system, and suggests that "if judges' pensions were impaired after a bankruptcy [they] would argue fiercely that their

8

pensions could not be touched because of the contracts clause of the United States and California Constitutions." The clear implication behind this comparison is the suggestion that this court's analysis of his contract claim would be colored by the panel members' self-interest in preserving their own judicial pensions. Not only is the implication both improper and insulting, the comparison is legally specious.

The FDIC's power to regulate Luckey's contractual right to payment is not derived from some arbitrary governmental prerogative to impose its will on retirement provisions whenever and however it chooses. This is not a case, as Luckey seems to be implying, where a shadowy government regulator has emerged from nowhere and curtailed the parties' ability to enter into and enforce their agreement in a manner they could not have anticipated. Here, the FDIC was *invited* to regulate many aspects of the Bank's financial dealings when the Bank signed on as a member of the FDIC.

More significantly, Luckey's employment agreement specified that the Bank's obligation to pay him the "change in control" bonus and the severance compensation would be "restricted by any then applicable policy . . . of the [FDIC,]" and thus that the Bank would be adhering to all FDIC restrictions in effect at the time such payments became due. Consequently, those restrictions were effectively *incorporated into his contract*. It is well-settled that "'"'all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated.'"'" (*Swenson v. File* (1970) 3 Cal.3d 389, 393.)

The fact that Luckey's agreement with the Bank explicitly acknowledged the binding effect of FDIC regulations means there is no need to rely on a *presumption* that the parties had the FDIC's regulatory authority in mind when they entered into their agreement. Rather, it is indisputable that the parties intended the Bank's payment obligations would be restricted by the FDIC policies in effect at the time those payments

9

became due. There is simply nothing in this record to support Luckey's notion that the FDIC's supposed regulatory intrusion impaired his vested contractual rights. The suggestion is wholly unfounded.

Consequently, the only significant issues we need to address are whether the trial court properly applied those FDIC regulations in this case; i.e., whether it properly determined that Luckey's "change in control" bonus and his severance compensation *qualified* as "golden parachute" payments under the applicable definition, and alternatively whether payment of the bonus was also prohibited because of the Bank's undercapitalized status. We conclude that while the court was correct in determining the severance compensation" qualified as a "golden parachute," it was incorrect in applying that label to the "change in control" bonus. The Bank's liability for that bonus was never made contingent upon the termination of Luckey's employment, and thus it did not qualify under the statutory definition of a FDIC "golden parachute." However, we also conclude that payment of the bonus was separately prohibited due to the Bank's declared status as undercapitalized.

And because we agree with the trial court that the "Severance Compensation" was restricted as a "golden parachute," we need not reach the Bank's alternative contention that its contractual obligation to make that payment was contingent upon Luckey's execution of a formal "severance agreement," which he admits he did not do.

### 3. The FDIC's "Golden Parachute" Rule

Section 1828(k)(4)(A), offers the general definition of what qualifies as a potentially prohibited "golden parachute" payment by an FDIC insured institution: "In general. The term 'golden parachute payment' means any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party pursuant to an

10

obligation of such institution or covered company that-- [¶] **(i)** is contingent on the termination of such party's affiliation with the institution or covered company; and [¶] **(ii)** is received on or after the date on which-- [¶] . . . [¶] **(III)** the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition . . . ."

An "institution affiliated party" (IAP), is defined as "any director, officer, employee, or controlling stockholder . . . of, or agent for, an insured depository institution." (§ 1813(u)(1).) There is no dispute that Luckey meets the definition of an IAP. It is also undisputed that the Bank had been identified by the FDIC to be in a troubled condition before the date that Luckey's employment agreement specified he would become entitled to receive both his "change in control" bonus and his severance compensation, and that the Bank's "continuously deteriorating financial condition" prompted the FDIC to issue a Cease and Desist Order in April 2009. Thus, under section 1828(k)(4)(A), these payments would qualify as "golden parachutes" if they are "contingent on the termination of [Luckey's] affiliation" with the Bank.

However, the FDIC's own regulation arguably expands that "golden parachute" definition somewhat. Title 12 Code of Federal Regulations part 359.1(f) (2014) states that "[t]he term golden parachute payment means any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or an affiliated depository institution holding company for the benefit of any current or former IAP pursuant to an obligation of such institution or holding company that: [¶] **(i)** Is contingent on, *or by its terms is payable on or after*, the termination of such party's primary employment or affiliation with the institution or holding company; and [¶] **(ii)** Is received on or after . . . [¶] . . . [¶] **(C)** A determination . . . that the insured depository institution or depository institution holding company is in a troubled condition . . . ." (Italics added.) It is this additional language included in the

11

regulation which the Bank primarily relies upon in arguing the two payments provided for in Luckey's employment agreement qualify as "golden parachutes."

When a payment meets the definition of a "golden parachute," the FDIC regulations generally prohibit its disbursement.  (12 C.F.R. §§ 359.2, 359.4 (2014).)  However, as also explained in the regulations, such payments can be made if expressly approved by the FDIC, upon the request of either the institution or the IAP:  "An insured depository institution or depository institution holding company may agree to make or may make a golden parachute payment if and to the extent that:  [¶] (1)  The appropriate federal banking agency, with the written concurrence of the Corporation, determines that such a payment or agreement is permissible; or [¶] **(2)**  Such an agreement is made in order to hire a person to become an IAP either at a time when the insured depository institution or depository institution holding company satisfies or in an effort to prevent it from imminently satisfying any of the criteria set forth in § 359.1(f)(1)(ii), and the institution's appropriate federal banking agency and the Corporation consent in writing to the amount and terms of the golden parachute payment. . . . ;  Or [¶] **(3)**  Such a payment is made pursuant to an agreement which provides for a reasonable severance payment, not to exceed twelve months salary, to an IAP in the event of a change in control of the insured depository institution; provided, however, that an insured depository institution or depository institution holding company shall obtain the consent of the appropriate federal banking agency prior to making such a payment . . . ."  (12 C.F.R. § 359.4(a)(1) – (3) (2014).)

The regulation further provides that "[a]n insured depository institution, depository institution holding company or IAP making a request pursuant to paragraphs (a)(1) through (3) of this section shall demonstrate that it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe, at the time such payment is proposed to be made, that:  [¶] . . . [¶] **(ii)**  The IAP is substantially responsible for . . . the troubled

12

condition, as defined by applicable regulations of the appropriate federal banking agency, of the insured depository institution, depository institution holding company or any insured depository institution subsidiary of such holding company. . . .” (12 C.F.R. § 359.4(a)(4) (2014).)

Finally, “In making a determination [whether there is reasonable basis to believe the IAP is substantially responsible for the institution’s troubled condition] the appropriate federal banking agency and the Corporation may consider:  [¶] **(1)**  Whether, and to what degree, the IAP was in a position of managerial or fiduciary responsibility; [¶] **(2)**  The length of time the IAP was affiliated with the insured depository institution or depository institution holding company, and the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment; and [¶] **(3)**  Any other factors or circumstances which would indicate that the proposed payment would be contrary to the intent of section 18(k) of the Act or this part.” (12 C.F.R. § 359.4(b) (2014).)

In this case, there is nothing in the record suggesting that either the Bank or Luckey ever requested that the FDIC approve disbursement of the disputed payments provided for in Luckey’s employment agreement.  And because it is the FDIC, and not the courts, which has been given this discretion to approve “golden parachute” payments, our assessment of whether the FDIC would have (or should have) approved these payments to Luckey, if requested to do so, is immaterial.

*4. Luckey’s “Severance Compensation” Payment Qualifies as a Golden Parachute*

We have no difficulty concluding the trial court correctly determined that Luckey’s severance compensation met the statutory definition of an FDIC “golden parachute.”  First, as we have already noted, there is no dispute that Luckey qualified as an IAP of the Bank, and no dispute that the Bank had been assessed by the FDIC to be in a troubled condition before those payments became due.

13

Thus, the only remaining question to be addressed in determining whether the severance compensation qualified as an FDIC "golden parachute" is whether it "is contingent on the termination of [Luckey's] affiliation with the institution or covered company." (§ 1828(k)(4)(A)(1).) And the answer to that question is clearly yes.

The Bank's obligation to pay Luckey's severance compensation was initially provided for in Section 12 of his employment agreement, as part of an exception to the general rule that his employment "shall not be terminated due to a Change of Control." The exception provided that the Bank "may" nonetheless terminate Luckey's employment "effective upon a Change in Control . . . *in consideration of the agreement . . . to pay [Luckey] the Severance Compensation*." (Italics added.) Thus, from the inception of Luckey's employment, his right to receive the severance compensation payment was always contingent upon the Bank's decision to *terminate his employment* in connection with a "change in control." The payment thus met the FDIC's definition of a "golden parachute."

And of course, because one of the terms of Luckey's employment agreement was that the Bank's obligation to pay either Luckey's severance compensation or his "change in control" bonus was subject to "restrict[ion] by any then applicable policy of the . . . FDIC . . . ," those FDIC restrictions were at all times *part of the agreement*. Thus, the FDIC's prohibition against making a "golden parachute" payment absent its express approval must be treated as though it had been *written into* the parties' contract, and we reject Luckey's repeated assertions that adherence to this regulation would illegally impair his right to payment in accordance the contract terms.

Consequently, because the Bank's payment of the severance compensation to Luckey would qualify as a "golden parachute" under FDIC regulations, we conclude the trial court correctly ruled that in the absence of the FDIC's explicit approval, the Bank had no contractual obligation to make that payment.

14

Luckey's arguments to the contrary are unavailing. His assertion that his right to the severance compensation is "vested" adds nothing to his claim. The only contractual right that could have "vested" is the one set forth in the agreement, which as we have already explained, was expressly made subject to FDIC restrictions. Pursuant to those restrictions, Luckey has no enforceable right to payment of the severance compensation under Section 12 of his employment agreement, absent FDIC approval.

And while it may be true that the Bank was not in troubled condition when Luckey's employment agreement was entered into in 2006, the point is immaterial. No *payment* was owed at that point. The Bank's financial condition only becomes significant at the point when it would otherwise be obligated to make a potential "golden parachute" payment to an IAP. If the Bank is in troubled condition at that time, the *payment* must be approved by the FDIC. Similarly, it is irrelevant that the FDIC approved the terms of Luckey's employment agreement when it was entered into. Because that agreement expressly conditioned the Bank's obligation to pay severance compensation to Luckey on its compliance with "then applicable policy" of the FDIC, nothing in the FDIC's approval can be spun into supporting *an exemption* from its regulations.

And of course, the fact that procedures exist for obtaining FDIC approval of the "golden parachute" payment is of no assistance to Luckey, as there is no evidence those procedures were ever invoked. Stated simply, unless the FDIC *has approved* the "golden parachute" payment, the Bank is prohibited from disbursing it. (12 C.F.R. §§ 359.2, 359.4 (2014).)

Finally, Luckey attacks the significance of a FDIC ruling set forth in the Federal Register (61 Fed. Reg. 5926 (Feb. 15, 1996)), to the effect that once an individual's golden parachute payment has been prohibited, it is prohibited forever. He argues this ruling should be disregarded, because it was never incorporated into a formal regulation and is thus no more binding on the courts than "*Vanity Fair, Rolling Stone, or*

15

*Gentlemen's Quarterly*." However, Luckey ignores the well-settled principal that courts will defer to an administrative agency's interpretation of its own regulations. (*Pacific Legal Foundation v. Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 111 [courts defer to an agency's interpretation of its own regulations because of its expertise in that area of the law]; *Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 965 [courts "generally defer to an agency's interpretation where the agency "'possess[es] special familiarity with satellite legal and regulatory issues"'"].) Thus, absent some argument explaining why the ruling set forth in the Federal Register (61 Fed. Reg. 5926 (Feb. 15, 1996)), is an erroneous application of the FDIC golden parachute regulations (and Luckey offers none), we presume it is correct.

*5. Luckey's Change in Control Bonus Does not Qualify as a "Golden Parachute"*

By contrast to the severance compensation payment, Luckey's right to the separate "change in control" bonus was never made dependent upon the termination of his employment with the Bank. Instead, under the terms of Luckey's employment agreement, the Bank (or its successor) was obligated to pay Luckey this bonus if the Bank experienced a defined "change in control," even though the agreement also specified, as a general matter, that his employment "shall not be terminated due to a Change in Control." The only exception to this general rule prohibiting termination of Luckey's employment in connection with a change in control allowed the Bank (or its successor) to do so on condition that it agreed to pay him the *additional* severance compensation also provided for in the agreement. Thus, it is only the severance compensation, not the bonus payment, which was contractually dependent upon the *additional* circumstance of Luckey's employment being terminated in connection with a "change in control."

Based on the foregoing, we conclude that Luckey's "change in control" bonus does not qualify as a "golden parachute" under the definition set forth in

16

section 1828(k)(4)(A)(i), because it was never made "contingent on the termination of [his] affiliation with the institution."

On the other hand, as we have already acknowledged, the FDIC's own *regulation* arguably expanded that "golden parachute" definition somewhat. Title 12 Code of Federal Regulations part 359.1(f) (2014) states that "[t]he term golden parachute payment" refers to any payment which "[i]s contingent on, *or by its terms is payable on or after,* the termination of such party's primary employment or affiliation with the institution or holding company; and [¶] **(ii)** Is received on or after . . . [¶] . . . [¶] **(C)** A determination . . . that the insured depository institution or depository institution holding company is in a troubled condition . . . ." (Italics added.) It is this distinct language, found in the regulation but *not the statute*, which the Bank relies upon in arguing that Luckey's "change in control" bonus – which, after all, was scheduled to be paid on the same date his employment was terminated in connection with the Bank's change in control – qualifies as a "golden parachute." While we do find some surface appeal in the argument, we reject it.

First, we note that as a rule, any inconsistency between the language of a statute and the language of a regulation must be resolved in favor of the statute. This is true under both state and federal law. (*California School Bds. Assn. v. State Bd. of Education* (2010) 191 Cal.App.4th 530, 544 ["an agency does not have discretion to promulgate regulations that are inconsistent with the governing statute, alter or amend the statute, or enlarge its scope"]; *Chevron, U.S.A., Inc. v. NRDC, Inc*. (1984) 467 U.S. 837, 842-843 [104 S.Ct. 2778, 81 L.Ed.2d 694] ["If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"].) Thus, we would be required to reject any regulation which expands the definition of a "golden parachute" beyond the one set forth by Congress in the applicable statute.

17

But we need not do so in this case, as we conclude the regulation's additional reference to a payment which "*by its terms* is payable on or after, the termination of . . . employment" (12 C.F.R. § 359.1(f)(1)(i) (2014), italics added) does not imply any intention to go beyond the statute's reference to payments that are "contingent" on termination. Instead, the regulation's reference to a payment which "by its terms" is payable on or after termination must be construed literally, i.e., as applying to those obligations which specify, *as a term*, that payment will not be made until "on or after" employment termination, whenever that might be. Under this interpretation, it is not sufficient to simply compare *the date* of employment termination with *the date* a particular payment obligation becomes due, as the Bank has done in this case. Instead, the Bank would be required to demonstrate that the termination of employment was *a necessary prerequisite to* the purported "golden parachute" payment obligation, which it has failed to do in connection with Luckey's change in control bonus.

And because we conclude the Bank has failed to demonstrate that Luckey's right to payment of the "change in control" bonus specified in his employment agreement qualified as a "golden parachute" under the definition set forth in section 1828(k)(4)(A), the court erred in determining the Bank was entitled to summary judgment on that basis.

*6. The FDIC's Declaration that the Bank was "Significantly Undercapitalized" Relieved it of any Obligation to pay the "Change in Control" Bonus*

As an alternative to the "golden parachute" rule, the Bank's motion for summary judgment also relied on the undisputed fact that as of May 28, 2009, it had been declared "significantly undercapitalized" by the FDIC. The Bank argued that pursuant to section 1831o(f)(4), which prohibits a "significantly undercapitalized" insured institution from "pay[ing] any bonus to any senior executive officer," without "prior written approval" of the FDIC, it was prohibited from paying the "change in control" bonus to Luckey.

18

Having already concluded that the "change in control" bonus qualified as a "golden parachute," the trial court did not reach this issue. We find the Bank's assertion meritorious.

The Bank's motion established that it had been deemed significantly undercapitalized by the FDIC as of May 28, 2009 – a week before Luckey's "change in control" bonus was to become due. Luckey did not dispute that fact. And according to 12 Code of Federal Regulations part 325.102 (2014), once the Bank is deemed to be a significantly undercapitalized institution, it retains that status – and thus remains subject to the restrictions pertaining to that status – until such time as the FDIC notifies it that its capital category has been changed: a "bank shall be deemed to be within a given capital category for purposes of section 38 of the FDI Act and this subpart as of the date the bank is notified of, or is deemed to have notice of, its capital category . . . ." There is no evidence in our record, and Luckey nowhere claims, that the Bank's capital category was ever changed by the FDIC after May 28, 2009. Luckey also makes no claim that payment of his "change in control" bonus was ever approved by the FDIC. Given these undisputed facts, the Bank was prohibited by section 1831o(f)(4), from paying Luckey a "change in control" bonus.

## DISPOSITION

The judgment in favor of the Bank is affirmed.  The Bank is to recover its costs on appeal.


RYLAARSDAM, ACTING P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.