Filed 8/24/20  In re H.D. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re H.D. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E074648 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1700027) |
| v. | OPINION |
| S.D., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Susanne S. Cho, Judge.

Affirmed.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Prabhath D. Shettigar, Deputy County Counsels, for Plaintiff and Respondent.

1

S.D. (Mother) appeals from the juvenile court's order terminating parental rights to her sons, H.D. and C.D. Mother raises a substantial evidence challenge to the court's finding that the children were likely to be adopted. We conclude that substantial evidence supported the finding, and we therefore affirm.

BACKGROUND

I. *The Prior Dependency Case*

In January 2017, the juvenile court detained newborn H.D. and his two half sisters, 14-year-old Z.A. and 13-year-old A.A. (Z.A. and A.A. are not subjects of this appeal.) The referral to Riverside County Department of Public Social Services (DPSS) alleged that Mother had tested positive for amphetamine, methamphetamine, and marijuana at H.D.'s birth, and that H.D. had tested positive for amphetamine and methamphetamine. Mother had tested positive for those substances at all three of her prenatal visits. She also acknowledged having mental health issues. In 2016, she was hospitalized twice under Welfare and Institutions Code section 5150. (Unlabeled statutory references refer to this code.) In addition, the half sisters reported domestic violence between Mother and A.D. (Father), and Father later tested positive for amphetamine, methamphetamine, and other substances. DPSS placed the children with maternal aunt.

DPSS filed a petition under section 300, subdivision (b), and the court found true allegations that Mother and Father abused controlled substances and engaged in domestic violence. The court adjudged the children dependents of the court, removed H.D. from the parents' custody and the half sisters from Mother's custody, and ordered reunification

2

services for both parents.  The court continued the parents' reunification services at the six-month review hearing.  At the 12-month review hearing, the court terminated reunification services as to Z.A. and set the matter for a section 366.26 hearing.  Z.A. wanted to stay with maternal aunt and refused to return to Mother's custody.  As to A.A. and H.D., the court ordered family maintenance services and returned H.D. to the parents' custody and A.A. to Mother's custody.  Mother gave birth to C.D. during the family maintenance period.  At an interim review hearing in July 2018, the court terminated jurisdiction over H.D. and A.A.

II. *The Present Dependency Case*

Six months later, in January 2019, DPSS received a referral alleging that Mother had been found outside nude, acting erratically and talking nonsensically.  Two-year-old H.D. was walking around the apartment complex unattended, and 10-month-old C.D. was in a playpen unattended.  It was further alleged that Mother had been smoking marijuana with 15-year-old A.A.  Mother was placed on a section 5150 hold.  When interviewed by the social worker, Mother acknowledged that she was using drugs, and the social worker found what appeared to be methamphetamine in a bathroom drawer of the home.  Father reported that Mother had kicked him out two weeks ago.  They had been fighting, and Mother had hit him in the face; she had also kicked over his motorcycle on two occasions.  Father tested positive for amphetamine and methamphetamine.  A.A. confirmed that she had smoked marijuana with Mother and that Mother also used

3

methamphetamine. A.A. had been caring for H.D. and C.D., including by safeguarding them in her bedroom when the parents engaged in domestic violence.

At a child and family team meeting, Father said that he was overwhelmed and not able to care for the children. He felt that Mother was not fit to care for the children either. Maternal aunt was willing to take the children again, but she needed financial assistance; maternal grandfather wanted to help maternal aunt care for them, but he could not take them full time because of his age.

DPSS filed a petition under section 300, subdivisions (b) and (g), alleging that Mother suffered from unresolved mental health and substance abuse issues; Father suffered from unresolved substance abuse issues; Father failed to protect H.D. and C.D. from Mother's substance abuse; the parents engaged in domestic violence in the presence of the children; the family home was in an unsafe and unsanitary condition; the parents had failed to benefit from services during the prior dependency; and Father was unwilling and unable to provide care and support for H.D. and C.D.

The court detained the children in February 2019, and DPSS placed the children with maternal aunt. In April 2019, the court found the allegations of the petition to be true with some minor modifications. The court adjudged the children dependents of the court, removed them from the parents' custody, denied both parents reunification services, and set the matter for a section 366.26 hearing.

In the section 366.26 report, DPSS recommended vacating the hearing as to A.A. because there was no one willing to adopt her or become her legal guardian at that time.

4

While maternal aunt was previously willing to pursue legal guardianship, she had changed her mind and had asked that A.A. be removed from her home. A.A. likewise did not want to live with maternal aunt. A.A. was skipping school, smoking marijuana, and had stolen maternal aunt's car. Maternal aunt could not meet A.A.'s needs or appropriately supervise A.A., given the girl's behavioral issues.

DPSS requested a continuance of the hearing for H.D. and C.D. because the social workers needed more time to assess placement issues. Maternal aunt wanted to adopt both boys, but the social worker opined that maternal aunt was overwhelmed with the number of children in her home—she had two biological children as well—and H.D. in particular was not getting the attention required to address possible developmental delays. H.D.'s speech did not appear to be on track. When he was initially placed with maternal aunt in February 2019, he could say several words. By September, he talked minimally or not at all. In addition, H.D. "explode[d]" when he was unable to complete simple tasks, such as stacking blocks, and he was aggressive toward C.D. DPSS wanted the Inland Regional Center to assess him for services.[1] C.D. was reportedly "a happy baby" and was developmentally on track. Both boys were overdue for well-child exams and dental exams.

---

[1]  Regional centers are part of the state's system for supporting the developmentally disabled. The California Department of Developmental Services "selects nonprofit corporations known as 'regional centers' to determine what services should be provided to the developmentally disabled. The regional centers in turn contract with various agencies or individuals to provide those services." (*Harbor Regional Center v. Office of Administrative Hearings* (2012) 210 Cal.App.4th 293, 306.)

The social worker also wanted more time to assess maternal aunt's financial condition, her child care plan, and whether there was a conflict with maternal aunt's ex-partner. According to maternal aunt, her ex-partner resided out of state, and he did not frequent the home or have contact with the children. But maternal aunt refused to guarantee that she and her ex-partner would not reconcile, and he refused to complete a live scan. Also, his name was on the home's lease, and maternal aunt did not want to remove his name because her income alone would not qualify her for the home. She had taken a 60-day leave from her job. Her main sources of income at that time were child support and foster care assistance. While maternal aunt had earlier employed a nanny to help with child care, A.A. had been babysitting H.D. and C.D. for two months when maternal aunt was working. DPSS advised maternal aunt that she needed to secure long-term child care and provided her with child care resources.

The court continued the section 366.26 hearing to allow DPSS to complete the preliminary adoption assessment. By the time of the assessment, H.D. was nearly three years old, and C.D. was about 18 months old. The social worker described H.D. as "a spitfire, rambunctious, loving and sweet." He enjoyed playing with toys, dancing, jumping off furniture, and "rough housing" with maternal aunt's son. H.D. slept through the night and took the occasional nap during the day. He had received his well-child examination, and he was scheduled for a speech evaluation and a dental examination. His pediatrician had also referred him for a developmental assessment and to behavioral therapy. H.D. had a limited vocabulary and would become upset when someone could

not understand him; he would throw himself to the ground, hit himself, or hit his head against the wall.  Maternal aunt was open to participating in interactive therapy with H.D.

The social worker described C.D. as "always . . . happy, smiling, [and] laughing." He was "always on the move" and did not like to sit still.  He enjoyed playing with toys and following H.D. around the house.  C.D. slept through the night and took two naps during the day.  He had also received his well-child examination, and the pediatrician found gross motor skill delays, speech delays, hearing concerns, and a history of kidney dysfunction.  But C.D. was able to communicate about his basic needs and was able to feed himself.  The pediatrician had referred C.D. to an audiologist, nephrologist, speech therapist, and physical therapist.  C.D. had appointments for a speech evaluation, physical therapy, and a dental examination.  Maternal aunt had tried to schedule appointments with the audiologist and nephrologist, but those offices would not schedule the appointments without certain paperwork, and maternal aunt had agreed to follow up.

Maternal aunt's household included Z.A., maternal aunt's 12-year-old and 10-year-old sons, H.D., C.D., and A.A.  (After the adoption assessment, in December 2019, DPSS moved A.A. to a new foster home.)  The family lived in a four-bedroom, three-bathroom home.  Maternal aunt was a licensed vocational nurse and still on leave from her job to focus on parenting H.D. and C.D.  But she planned to return to work in January 2020 and wanted to hire live-in child care, and she had applied for child care as of November 2019.  She currently met the family's needs with child support income, guardianship funds for Z.A., and foster care funds.  Maternal aunt had no physical

7

ailments, but she had been diagnosed with anxiety, depression, and bipolar disorder. She managed her condition with psychotropic medication, was under the care of a psychiatrist, and was stable. She had proactively sought counseling to deal with the stress caused by a custody dispute over her sons and by parenting six children in various developmental stages.

Maternal aunt and maternal grandfather were close and served as each other's support system. He supported her adoption of H.D. and C.D. but was recovering from open heart surgery. Maternal aunt was not as close with maternal grandmother, but maternal grandmother also supported the adoption, and she was an "involved grandmother." Maternal grandmother was willing to help transport H.D. and C.D. to appointments when she was available.

Maternal aunt had been in an on-and-off relationship with her ex-partner for the past nine years. During H.D.'s prior dependency case, in August 2017, maternal aunt had reported that she was in a seven-year relationship. When DPSS said that her partner would need to complete a live scan, she stated that the relationship had ended in January 2017. She explained that while they remained friendly, her ex-partner did not frequently visit the home, and she never left the children with him unsupervised.

Maternal aunt and her ex-partner moved into her home in August 2018, and he moved out in October 2018. He moved to Arizona, and they were no longer in a relationship. He did not pay any of the household expenses. The relationship ended in part because of his unwillingness to submit to a background check by DPSS. But he and

maternal aunt remained friendly, and she did "not know what the future [held] for them as a couple."

Maternal aunt loved H.D. and C.D. and wanted to give them a safe and stable home. The boys were too young to understand adoption, but they were bonded to maternal aunt and to both half sisters. Maternal aunt struggled with scheduling all of the boys' medical and counseling appointments while she was working. But she was nevertheless committed to adoption. The social worker thought that maternal aunt was "less overwhelmed" and had invested more time in meeting each boy's medical, dental, and mental health needs. The social worker opined that there was a high likelihood of the children being adopted and recommended that the court allow maternal aunt to proceed with adoption.

The continued section 366.26 hearing took place in January 2020. The court found clear and convincing evidence that H.D. and C.D. were likely to be adopted, and it terminated parental rights.

## DISCUSSION

Mother argues that the record does not contain substantial evidence establishing the children were likely to be adopted. More specifically, she asserts that the evidence was insufficient to show the children were either generally or specifically adoptable. The argument lacks merit.

If the juvenile court finds clear and convincing evidence that it is likely a dependent child will be adopted, the court shall terminate parental rights and order the

9

child placed for adoption (unless an exception applies). (§ 366.26, subd. (c)(1).) The clear and convincing evidence standard "requires a finding of high probability." (*In re Angelia P.* (1981) 28 Cal.3d 908, 919.) "A child's young age, good physical and emotional health, intellectual growth and ability to develop interpersonal relationships are all attributes indicating adoptability." (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.) It is not necessary that the child already be in a preadoptive home or with a foster parent who is prepared to adopt. (§ 366.26, subd. (c)(1); *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) Nevertheless, the foster parent's "willingness to adopt generally indicates the [child] is likely to be adopted within a reasonable time either by the [foster] parent *or by some other family.*" (*In re Sarah M.*, at p. 1650.)

Some courts have distinguished between generally and specifically adoptable children. General adoptability refers to cases in which the child's personal characteristics are sufficiently appealing that it is likely the child will be adopted within a reasonable time. (*In re R.C.* (2008) 169 Cal.App.4th 486, 492-493.) Specific adoptability refers to "unusual cases where a child, due to severe physical or mental needs, may be deemed adoptable based solely on the fact that a particular family wants to adopt the child." (*In re Mary C.* (2020) 48 Cal.App.5th 793, 802 & fn. 5.)

But the juvenile court is not required to find the child "'generally' or 'specifically' adoptable." (*In re Mary C.*, *supra*, 48 Cal.App.5th at p. 802.) Section 366.26 does not speak in terms of general or specific adoptability. Nor does the law require DPSS's assessment to include evidence of general or specific adoptability—DPSS must merely

analyze "the likelihood that the child will be adopted." (§§ 366.21, subd. (i)(1)(G), 366.22, subd. (c)(1)(F).) Moreover, "[a]lthough a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

Our review accounts for the heightened standard of proof in the trial court. We must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable" that the children were likely to be adopted. (*Conservatorship of the Person of O.B.* (July 27, 2020, No. S254938) __ Cal.5th __ [2020 Cal. Lexis 4646, at pp. *4, *34].) But we do not reweigh the evidence. (*Id.* at p. *29.) We "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. *34-*35; accord *In re R.C.*, *supra*, 169 Cal.App.4th at p. 491 ["We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence"].)

As a preliminary matter, DPSS argues that Mother forfeited her claim by not raising it in the juvenile court, relying on cases in which the parent challenged the adequacy of a preliminary adoption assessment. (See, e.g., *In re A.A.* (2008) 167 Cal.App.4th 1292, 1316-1317.) But we do not construe Mother's argument as challenging the adequacy of the adoption assessment. Instead, she challenges the

11

sufficiency of the evidence supporting the court's finding that the children are likely to be adopted. DPSS bore the burden of proof on that issue, and mother was not required to object to DPSS's failure to carry its burden in order to preserve the issue for appeal. (*In re Gregory A.*, *supra*, 126 Cal.App.4th at pp. 1560-1561.) This type of substantial evidence challenge is an exception to the forfeiture rule. (*Id.* at p. 1560.)

In this case, there was substantial evidence from which a reasonable factfinder could conclude that it was highly probable H.D. and C.D. were likely to be adopted. Both are quite young. The social worker described H.D. as loving and sweet and C.D. as always happy and smiling. Both children were capable of forging interpersonal relationships, as evidenced by their bonds with maternal aunt and their half sisters. Both children had no problems sleeping through the night and taking age-appropriate naps during the day. It is true that, in addition to those positive attributes, both children had some difficulties: H.D. exhibited a speech delay, needed a further developmental assessment, and needed behavioral therapy to address outbursts. C.D. exhibited delays in his gross motor skills and speech, had possible hearing problems, and had a history of kidney dysfunction. Still, at 18 months old, C.D. could feed himself and communicate his basic needs. And despite the children's various difficulties, maternal aunt was committed to adopting both of them. Their positive attributes and the presence of a foster parent committed to adoption constituted substantial evidence of the likelihood of adoption. (See *In re Mary C.*, *supra*, 48 Cal.App.5th at pp. 802-805 [substantial evidence supported adoptability of children with developmental delays, behavioral issues, and

emotional difficulties, given that they were "'young, sweet, and engaging,'" they could form loving and trusting relationships, and foster family wanted to adopt them]; *In re A.A.*, *supra*, 167 Cal.App.4th at pp. 1312-1313 [substantial evidence that children were likely to be adopted, given that they were young, bright, and making progress in addressing behavioral and emotional problems, and caregivers were committed to adoption].)

Mother asserts that there was no evidence of the children's general adoptability, so the court's finding necessarily depended on specific adoptability by maternal aunt. Further, Mother argues, the evidence did not support a finding that maternal aunt would be able to adopt, because maternal aunt (1) was unable to provide for the children financially and meet their other needs, and (2) she was in an ongoing relationship with a man who refused to complete a live scan. We are not persuaded by those arguments. First, as we have discussed, the court was not required to find the children generally or specifically adoptable—only that they were likely to be adopted. And the record does not support the conclusion that the court based its adoptability finding *solely* on maternal aunt's desire to adopt. The children's personal characteristics also supported that finding. This is not one of those "unusual cases" in which the children's mental or physical issues were so severe that they were likely to be adopted only if a specific caregiver desired adoption. (*In re Mary C.*, *supra*, 48 Cal.App.5th at p. 802, fn. 5.)

Second, even if the children were likely to be adopted *only* because maternal aunt was waiting in the wings, there was substantial evidence that she was likely to be a

13

suitable adoptive parent. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80 ["When a child is deemed adoptable only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child"].) She had been caring for the children for 11 months by the time of the section 366.26 hearing, and she had cared for H.D. during the prior dependency also. The children had a loving bond with her. Although she was overwhelmed earlier by caring for six children, she had taken steps to improve that situation. DPSS had moved A.A. to a new foster home at maternal aunt's and A.A.'s request, so maternal aunt no longer had to focus on A.A.'s behavioral and emotional issues. Maternal aunt had also taken a leave from work to focus on H.D. and C.D., and she had put in motion a plan to hire child care for the time when she returned to work. She had followed through with the children's various referrals to specialists or was in the process of doing so, and she had the support of maternal grandmother in transporting the children to their appointments. Moreover, her ex-partner's refusal to complete a live scan did not preclude a finding of adoptability. He was not in the children's lives. Maternal aunt said that they were no longer in a relationship, he lived in another state, and he did not frequent the home. Mother asserts that "no reasonable fact finder could have believed" the relationship had ended. But Mother is merely asking us to reassess maternal aunt's credibility. We "may not insert [our] own views regarding the credibility

14

of witnesses in place of the assessments conveyed by" the court's finding. (*Conservatorship of the Person of O.B.*, *supra*, [2020 Cal. Lexis 4646, at p. *29].)

In sum, substantial evidence supported the court's finding that it was highly probable H.D. and C.D. were likely to be adopted. The court did not err by making such a finding and freeing them for adoption.

DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.
SLOUGH
J.